E-filing

Gregory A. Wedner, SBN 067965
Sloan R. Simmons, SBN 233752
**LOZANO SMITH**
2000 Crow Canyon Place, Suite 200
San Ramon, CA 94583-1344
Telephone: (925) 302-2000
Facsimile: (925) 302-2010

Attorneys for Defendant
ALAMEDA UNIFIED SCHOOL DISTRICT

ORIGINAL
FILED
NOV 2 7 2007
RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

ADR

| | |
|---|---|
| M.P., | CASE NO. ____ C07-05989 EMC |
| Plaintiff, | **NOTICE OF REMOVAL OF ACTION; UNDER 28 U.S.C. § 1441(b) (FEDERAL QUESTION)** |
| v. | |
| OFFICE OF ADMINISTRATIVE HEARINGS et al., | |
| Defendants. | |

TO THE CLERK OF THE ABOVE-ENTITLED COURT:

PLEASE TAKE NOTICE that Defendant ALAMEDA UNIFIED SCHOOL DISTRICT

("District") hereby removes to this Court the state court action described below.

    1.    On November 14, 2007, an action was commenced in the Superior Court of

California for the County of Alameda, entitled *M.P. v. Office of Administrative Hearings et al.*, Case No.

RG 07356345, which is attached hereto and incorporated by reference as Exhibit "A." The Civil Case

Cover Sheet filed in the state court action is attached hereto and incorporated by reference as Exhibit

"B."

    2.    The first date on which the District received a copy of the said complaint/petition was

November 14, 2007, when the District was served with a copy of the said complaint/petition from the

said state court. The complaint/petition was *not* accompanied by a summons.

1    3.    This action is a civil action of which this Court has original jurisdiction under 28

2  U.S.C. section 1331, and is one which may be removed to this Court by the District pursuant to the

3  provisions of 28 U.S.C. section 1441(b), in that it arises under the Individuals with Disabilities

4  Education Improvement Act ("IDEIA") 20 U.S.C. sections 1400 *et seq.*, and specifically 20 U.S.C.

5  section 1415(i)(2)(A), which provides Plaintiff M.P. the right to bring a civil action in federal court

6  challenging a special education due process hearing decision issued by the Office of Administrative

7  Hearings ("OAH").

8    4.    All other defendants who have been served with the Complaint have joined in this Notice

9  of Removal, as evidenced by the Joinder of Defendant OAH filed concurrently herewith.

10

11  Dated:  November 21, 2007                          Respectfully submitted,

12                                                     LOZANO SMITH

13

14                                                     _____

15                                                     GREGORY A. WEDNER
                                                       SLOAN R. SIMMONS
16                                                     Attorneys for Defendant
                                                       ALAMEDA UNIFIED SCHOOL
17                                                     DISTRICT

18  00002\001\PLD\SR053666.WPD

19

20

21

22

23

24

25

26

27

28

LOZANO SMITH
2000 CROW CANYON PLACE, SUITE 200 SAN RAMON,    CA 94583-1344
TEL 925-302-2000  FAX 925-302-2010

**PROOF OF SERVICE**

I, Michelle Barty-Billeci, declare that I am employed in County of Contra Costa, California.  I am over the age of eighteen years and not a party to the within action.  My business address is 2000 Crow Canyon Place, Suite 200, San Ramon, California, 94583.

On the date below, I served the following document(s):

**NOTICE OF REMOVAL OF ACTION; UNDER 28 U.S.C. § 1441(b) (FEDERAL QUESTION)**

on each interested party in said cause as indicated below:

[  ]  **(BY PERSONAL SERVICE)** I caused a copy of said pleadings to be hand delivered to the interested parties at:

[  ]  **(BY FACSIMILE)** I caused a copy of said pleadings to be sent via facsimile transmission to the interested parties at the numbers listed below (see attached fax confirmation):

[  ]  **(BY OVERNIGHT MAIL)** I caused a copy of said pleadings to be sent by overnight mail to the parties listed below:

[ X ]  **(BY REGULAR MAIL)** I caused a copy of said pleadings to be placed in a United States mail depository, in a sealed envelope, with postage fully prepaid, to the below-named party.

```
Office of Administrative Hearings
Special Education Division
ATTN: Presiding Administrative Law Judge Sherianne Laba
2349 Gateway Oaks Drive, Suite 200
Sacramento, CA 95833-4231
Telephone: (916) 263-0880
Facsimile: (916) 376-6319
```

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.  Executed on November 27, 2007 at San Ramon, California.

_____
Michelle Barty-Billeci

LOZANO SMITH
2000 CROW CANYON PLACE, SUITE 200 SAN RAMON,   CA 94583-1344
TEL 925-302-2000   FAX 925-302-2010

NOTICE OF REMOVAL OF ACTION

-3-

M.P. v. OAH et al.
CASE NO._____

*M.P. v. Office of Administrative Hearings,* CASE NO. C 07-05989 EMC

**Notice of Removal of Action; Under 28 U.S.C. § 1441(b) (Federal Question)**

# Exhibit A

1   MR. & MRS. FRANCISCO PEDRAZA
    22 SOUZA COURT
2   ALAMEDA, CA. 94502
    (510) 522-9232
3
    LINDA PEDRAZA ON BEHALF OF
4   PETITIONER
    MICHAEL PEDRAZA
5
                    SUPERIOR COURT FOR THE COUNTY OF ALAMEDA
6                         IN THE STATE OF CALIFORNIA
                              APPEAL DIVISION
7
    MICHAEL PEDRAZA                    CASE NO.          07356345
8                                      OAH NO. N2006100740, N2007100793
    PETITIONER                         PETITION FOR APPEAL NUNC PRO TUNC ORDER
9                                      WRIT OF MANDATE
                                       MODEL STATE APA
10  VS.                                SEE ATTACH DECLARATION:
                                                        §4-301
11  OAH RESPONDENTS ET AL,                              4-216
                                                        4-217
12  _____                                      4-202 (C)
                                                        4-301 3-4
13                                                      4-208
                                                        4-106
14                                                      CCP §430.30
                                                        CCP  1094.5
15

16

17

18

19

20

21

22

23

24

25

                                       1

ENDORSED
FILED
ALAMEDA COUNTY

NOV 14 2007

CLERK OF THE SUPERIOR COURT
By  BARBARA LAMOTTE
                              Deputy

I am Linda Pedraza and my husband is Francisco Pedraza and we are the parents of Michael Pedraza, a student eligible for special education and related services through the Alameda Unified School District herein after "AUSD."  We write at this time to move for a *nunc pro tunc* appeal of the June 19, 2007 hearing decision rendered in the aforementioned cases by Judge Charles Marson.  The nature of the issues surrounding our notice of order involves our request for our counsel, Mr. Vernon Goins, (of Taylor & Goins Law Office) to file an appeal of the aforementioned cases.  It has recently come to our attention that a "complaint for damages" was filed by Mr. Goins in the Northern District Court of California, complaint No.C07-04781MEJ, however there was no mention of our request for the forthcoming cause for and request for an appeal of the ALJ hearing decesion. (See Exhibit A attached herewith)   Mr. Goins failed to exhaust our administrative remedies in this courts jurisdiction and by failing to do so, thus requiring us to intercede on the behalf of our son to pursue a correction of action. *"Courts have the inherent power to correct their records so that the records shall conform to the facts and speak the truth, and that right is not suspended because the record itself does not show that the entry was incorrect where an order has actually been made and its entry omitted, it may be entered subsequently, and if justice requires, may be made to take effect nunc pro tunc as of the date when it was actually made."* We further move to vacate the hearing decision recorded in the aforementioned case.  The nature of the issues surrounding our notice and request is captured in this document for your perusal and response.

2

A special education hearing was conducted in the aforementioned cases by the state agency, the Office of Administrative Hearing, here in after "OAH" from the 2nd of April 2007 through Friday, the 6th of April.   The parties recessed and returned for hearing on Tuesday, the 17th of April through Friday, April 20, 2007. (See Exhibit B attached herewith)

Petitioner did not receive an impartial and fair hearing; because, the OAH (the state agency) is a designated official of the California Department of Education here in after "CDE" who is and was identified as a *party in interest*" to a pending federal complaint No. 05-04977VRW in the Northern District Court of California.   Additionally, the Alameda Unified School District here in after the "AUSD," and the law firm, Lozano, Smith, who represents the AUSD, who is and was an identified party representing the AUSD in complaint No.05-04977VRW, and is also a *party in interest*" as the Local Education Agency here in after "LEA" works directly under the direction of "*the state*" and is the recipient of funding for certain education services to be provided to children with disabilities.   This relationship directly impedes our right to an impartial and fair hearing. The LEA knew that there were numerous issues which merged with the federal complaint.   The fact that the parties were the same, the issue all evolved around the students educational needs and the LEA deprivation of services are all directly related to complaint No. 05-04977VRW.   The merger of issues further imposed on our son's right to an impartial and fair hearing because the OAH did not recuse itself of it's duty as it was not possible for the OAH to judicate a matter in which it had a direct interest as a party to the federal complaint which the Federal District Court would subsequently be the deciding venue of these issues.

During the course of the hearing the ALJ: restrained my cross examination of witnesses, withheld my testimony regarding video of my son, suppressed evidence by only allowing portions of the evidence which supported the LEA argument, ignored the Districts substantative and procedural violations and requirements of the statues which requires the LEA to hold an IEP within a specific time frame after a request is made by a parent, and which also entitles us to meaningfully participate in the development of an appropriate individualized education plan for our son.

The ALJ willfully disregarded the LEA misconduct in barring us from the formulation process which did significantly impede us from participating in the formulation of an appropriate education for our son; and further deprived our son the IEP services agreed upon as an educational benefit. The ALJ further denied us reimbursement of the outlined IEP services and various expenses which we provided our son at our expense. Additionally, a substantial number of the issues which were outlined in Petitioner's initial case management statement were not addressed in the ALJ hearing decision.   The testimonies provided by the staff and various agencies, (who all work for and receive money from the AUSD) was biased and hence prejudiced the facts and directly contributed to Petitioner not receiving an impartial and fair hearing.  The most significant misconduct of the ALJ was the witnessed exparte communication with the LEA staff and the LEA counsel. Respectively, we request an appeal of the hearing decision by Judge Charles Marson. Our prayer for relief is a finding that the ALJ decision was biased and impartial and an order that the hearing decision recorded be stricken from the record for the aforementioned causes outlined in the previous paragraphs.

We further request the Office of Administrative Hearings be order to stay any and all hearings until this appeal is resolved as they are a "party in interest" to this appeal and our federal complaints. (See Exhibit C attached herewith) We also request that all pleadings made herein are expedited immediately as to prevent further delay to our son's educational needs.  I declare under the penalty of perjury under the laws of the State of California the foregoing statement to the best of knowledge and belief contains all the relevant facts relating to our request and such facts are true and correct and this Declaration was executed on November 14, 2007.

Prayerfully,

Linda L. Haynes-Pedraza

5

# Exhibit A

E-filing

VERNON C. GOINS II (#195461)
TAYLOR, GOINS &STALLWORTH LLP
1330 Broadway, Suite 1701
Oakland, CA  94612
Telephone:  (510) 893-9465
Facsimile:  (510) 893-4228

ORIGINAL
FILED
SEP 1 7 2007

ADR

LINDA PEDRAZA and FRANCISCO PEDRAZA,
individually and as guardians ad litem on behalf of their son
MICHAEL PEDRAZA

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

C07-04781

| | |
|---|---|
| LINDA PEDRAZA, et al., | COMPLAINT FOR DAMAGES. |
| Plaintiffs, | |
| vs. | |
| ALAMEDA UNIFIED SCHOOL DISTRICT, AND the CALIFORNIA DEPARTMENT OF EDUCATION, THE ALAMEDA COUNTY BOARD OF EDUCATION, ALAN NISHINO, individually and as the Superintendent of the Alameda County School District, ARDELLA DAILEY, as Superintendent of the Alameda Unified School District, DAVID WAX, individually and as Special Education Director of the Alameda County School District, THERESA ANDERBERG, as Special Education Director of Alameda Unified School District, CALIFORNIA DEPARTMENT OF EDUCATION and JACK O'CONNELL as State Superintendent of Public Instruction for the State of California. | |
| Defendants. | |

1

1    Plaintiffs LINDA PEDRAZA and FRANCISCO PEDRAZA, individually and as guardian ad

2    litmes on behalf of their son MICHAEL PEDRAZA a minor (collectively, the "Pedrazas" and

3    "Parents"), complain of Defendants and allege as follows:

4

5                            **JURISDICTION AND VENUE**

6         1.  This Court has original jurisdiction over this civil action and appeal pursuant to 28

7    U.S.C. § 1331 and 1343 in that the claims alleged herein arise under the laws of the United

8    States, including the Individuals with Disabilities Education Act (IDEA), as amended, 20 U.S.C.

9    § § 1400 et. Seq., expressly § 1415(i)(2).  Original jurisdiction is also conferred upon this Court

10   to redress the deprivation of these Plaintiffs' rights privileges and immunities secured by federal

11   statutes and the United States Constitution, pursuant to 42 U.S.C. § 1983; and to redress

12   discrimination against Plaintiffs based upon disability, pursuant to 29 U.S.C. § 794, commonly

13   known as Section 504 of the Rehabilitation Act (Section 504).

14        2.  This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 to hear and

15   determine the Plaintiffs' state law claims because those claims are related to Plaintiffs' federal

16   law claims and arise out of a common nucleus of related facts.  Plaintiffs' state law claims are

17   related to Plaintiffs' federal law claims such that those claims form part of the same case or

18   controversy under Article III of the United States Constitution.

19        3.  Venue in this Court is proper under 28 U.S.C. § 1391(b) in that all defendants reside,

20   maintain offices, or enforce implementation of laws relevant to this litigation in this judicial

21   district of California and all the events which are the subject of this complaint occurred within

22   this District.

23                           **DEMAND FOR JURY TRIAL**

24        4.  Plaintiffs hereby demand a jury trial pursuant to Federal Rule of Civil Procedure,

25   Rule 38(b).

**PARTIES**

5. Plaintiff MICHAEL PEDRAZA (Student) is a minor, born on October 25, 1999, identified as an individual with disability within the meaning of 20 U.S.C. § 1401(3) and is an individual with exceptional needs within the meaning of California Education Code § 56026. He is entitled to receive and has received special education and related services as a resident of Alameda County in the city of Alameda, California and at all times resided in the Alameda Unified School District service area. The Student is a person who has a physical or mental impairment that substantially limits one or more major life activities within the meaning of 34 Code of Federal Regulations § 104.3(i) and therefore, is a student entitled to be free from discrimination based upon his disability pursuant to Section 504.

6. Plaintiff, LINDA PEDRAZA (Mother) is the parent and guardian ad litem of the Student, and at all times was and continues to reside in Alameda County, City of Alameda, California.

7. Plaintiff, FRANCISCO PEDRAZA (Father) is the parent and guardian ad litem of the Student, and at all times was and continues to reside in Alameda County, City of Alameda, California.

8. Defendant ALAMEDA COUNTY BOARD OF EDUCATION (AUSD Board) is and was, at all relevant times, the duly constituted and acting governing board of the Alameda Unified School District and is responsible for education, in compliance with federal and state law, of students attending school, receiving and/or entitled to receive a public education within the AUSD service area.

9. Defendant, ALAMEDA UNIFIED SCHOOL DISTRICT (AUSD), is a public school district and local educational agency duly organized and existing under California law and is located within Alameda County. At all relevant times, the AUSD was responsible for providing

3

1  the Student, specifically, and school children within its services area generally, with full and

2  equal access to public education and activities it offers in compliance with federal and state law

3  and for providing the Student with a free and appropriate public education (FAPE) in conformity

4  with the IDEA and corresponding California Education Code requirements. The AUSD receives

5  federal funding and financial assistance, including, but not limited to, funding under the IDEA.

6      10.    The AUSD Board and the AUSD collectively are referred to herein as the "Local

7  Defendants."

8      11.    Defendant ALAN NISHINO is and was, at relevant times mentioned,

9  Superintendent of the AUSD. He was appointed by the AUSD Board to implement policies

10  established by the AUSD Board and/or mandated by federal and state law. He is responsible for

11  ensuring that the AUSE complies with all administrative orders issued by the California

12  Department of Education in connection with a request for an administrative hearing pursuant to

13  the IDEA and corresponding California law. AUSD's superintendent is responsible for

14  supervising Defendants David Wax and Theresa Anderberg, who were directors of special

15  education for AUSD consecutively. He is named as a defendant in his individual and official

16  capacity and, based upon information and belief, is a resident of Alameda County, California.

17      12.    Defendant ARDELLA DAILEY is and was, at relevant times mentioned,

18  Superintendent of the AUSD. She was appointed by the AUSD Board to implement policies

19  established by the AUSD Board and/or mandated by federal and state law. She is responsible for

20  ensuring that the AUSD complies with all administrative orders issued by the California

21  Department of Education in connection with a request for and administrative hearing pursuant to

22  the IDEA and corresponding California law. She is named as a defendant in her individual and

23  official capacity and, based upon information and belief, is a resident of Alameda County,

24  California.

25

4

13.    Defendant DAVID WAX (Former Director), was Director of Special Education for the AUSD at all times relevant to claims against him up to and including January 2005. As Director of Special Education for AUSD, his duties and authority included assuring that all students within the AUSD who were eligible for special education and related services pursuant to the IDEA, including the Student, were provided with a FAPE. As Director of Special Education, he also was responsible for ensuring that AUSD complied with all administrative orders issued by the California Department of Education regarding AUSD in connection with a request for an administrative hearing pursuant to the IDEA and corresponding California law. He is named herein as a defendant in his individual and official capacity and, based upon information and belief, is a resident of Alameda County, California.

14.    Defendant ROLASIND DAVENPORT (SPED Director), is and was, Director of Special Education for AUSD at all times relevant to claims against her, commencing in or about January 2005. As Director of Special Education for AUSD, her duties and authority included assuring that all students within the AUSD who were eligible for special education and related services pursuant to the IDEA, including the Student, are provided with a FAPE, SPED Director Davenport also is and was responsible for ensuring that AUSD complied with all administrative orders issued by the California Department of Education regarding AUSD. She is named herein as a defendant in her individual and official capacity and, based upon information and belief, is a resident of Alameda County, California.

15.    Defendant THERESA ANDERBERG (Former SPED Director), is and was, Director of Special Education for AUSD at all times relevant to claims against her, commencing in or about January 2005. As Director of Special Education for AUSD, her duties and authority included assuring that all students within the AUSD who were eligible for special education and related services pursuant to the IDEA, including the Student, are provided with a FAPE, SPED Director Anderberg also is and was responsible for ensuring that AUSD complied with all

5

administrative orders issued by the California Department of Education regarding AUSD. She is named herein as a defendant in her individual and official capacity and, based upon information and belief, is a resident of Alameda County, California.

16.    Superintendent ALAN NISHINO, Superintendent ARDELLA DAILEY, Former Director DAVID WAX, Special Education Director ROSLAIND DAVENPORT and Former Special Education Director THERESA ANDERBERG are referred to herein collectively as "the Individual Defendants."

17.    Defendant, CALIFORNIA DEPARTMENT OF EDUCATION (CDE), is the State governmental entity mandated and established to oversee the operation of public schools and delivery of public education entitlements in the State of California. CDE is responsible for ensuring that all children in California receive public education services pursuant to federal and state law, and to ensure that all children with disabilities and exceptional needs in California receive a FAPE pursuant to the IDEA and California law, and to ensure that local educational agencies, including AUSD, comply with the provisions of the California Education Code and the IDEA.

18.    Defendant JACK O'CONNELL (Superintendent O'Connell) is State Superintendent of Public Instruction for California. Superintendent O'Connell's duties include overseeing the operations of California public schools, executing State policies implementing federal and state law regarding the provision of public education to all children with disabilities and exceptional needs in California; monitoring compliance of public schools and local educational agencies with federal and State law and ensuring that violations of federal and/or State law by state and/or local educational agencies are promptly investigated and corrected. In California the State Superintendent of Public Instruction exclusively is authorized to bring an action to enforce an order issued pursuant to California's Complaint Resolution Procedures

6

1   (CPR). Superintendent O'Connell is named as a defendant herein in his official capacity. CDE

2   and Superintendent O'Connell are referred to collectively herein as "State Defendants."

3       19.    Plaintiffs are informed and believe and therefore allege that each of the

4   defendants named herein is responsible for the pattern and practice of events alleged, or is a

5   necessary party for obtaining appropriate relief. In performing each of the acts alleged, and in

6   their failure to fulfill their legal responsibilities set forth herein, each defendant acted jointly or

7   individually for each other and for all other defendants. The injuries suffered by plaintiffs, and

8   each of the, occurred because of the actions and omissions of the named defendants.

9                           **FACTUAL ALLEGATIONS**

10      20.    The Student is eligible for special education and related services due to autism.

11  On or about June 4, 2004, the Student's Parents participated in the individual educational plan

12  (IEP) team meeting with staff members of the AUSD. At this time, the District offered services

13  to the Student for the 2004-2005, 2005-2006 and 2006-2007 school year in an IEP and the

14  Parents agreed and signed IEP. Shortly thereafter, this IEP was amended pursuant to a January

15  25, 2005 addendum. The IEP and January 2005 addendum outlined certain behavioral services,

16  behavioral program supervision, occupational therapy services, speech and language services to

17  be provided at the expense of the District including but not limited to:  a full time one-to-one

18  adult aide; speech and language services for 60 minutes three times a week; individual

19  occupational therapy for 60 minutes two times per week; 540 minutes a week of behavioral

20  services at home; 60 minutes a week of behavioral supervision at home or school.

21      21.    According to the IEP, the District promised to assess the Student in a timely

22  appropriate and accurate manner. Despite several assessments, the District failed to, among

23  other things:  propose goals and objectives; provide recommendations for frequency and duration

24  of services;  failed accurately reflect Student's cognitive or intellectual functioning.

25

22.    On or about January 5, 2006, Parents and AUSD met to discuss the aforementioned issues and concerns regarding the assessments. At the conclusion of this meeting, AUSD agreed to pay for an Independent Educational Assessment ("IEE") and reimburse Parents for any costs or expenses associated therewith.

23. On or about January 19, 2006, Parents provided AUSD with the identification and curriculum vitae of an individual qualified, designated and selected by Parents to conduct the IEE named Lowy Apple. When AUSD did not respond, Parents then wrote to notify AUSD that it would obtain an IEE at AUSD's expense. Parents also requested a meeting with AUSD to discuss the content of the letter and the steps necessary to complete the IEE.

24.    On June 7, 2004, the District offered services to the Student for the 2004-2005, 2005-2006 and 2006-2007 school year in an IEP and the Parents agreed and signed IEP. These services also consisted of providing Applied Behavior Analysis ("ABA") services. Despite AUSD's promise, it failed to ensure the delivery of such services in that: AUSD knew that ABA services provided by selected agencies, could not be provided in a timely manner; selected failed to provide services despite the Parents initiation of the process by submitting an initial application; lack of qualified personnel by agencies to provide appropriate and necessary treatment.

25.    From 2004 through 2006, the IEP team and the Parents met on numerous occassions to discuss AUSD's provision of occupational therapy services. Shortly thereafter and based on assessment, it was determined that Student needed services in a clinic setting and in a separate motor room that AUSD did not have. Despite being notified of the Student's needs, AUSD did not provide such services and has not provided occupational therapy services since 2005.

26.    Additionally, AUSD has significantly impeded engaged in acts and omissions that have significantly impeding Parents' right to participate in the decision making process relating

8

to the Student's education: failing to hold an IEP on a triennial basis; failing to provide

assessment reports to Parents before IEP meetings; failing to provide timely notice of

termination of services; failing to make an offer of placement to Student in 2006; failing to have

a representative of proposed behavioral services present at IEP meetings; precluding Parents

from observing placements;

27.    In or about June 2006, the Students' mother and father (Parents) initiated due

process proceedings on behalf of themselves and the Student pursuant to 20 U.S.C. § 1415 and

California Education Code §§ 56500 et seq.  The Parents filed a complaint pursuant to 20 U.S.C.

§ 1415, with the Office of Administrative Hearings-Special Education Division (OAH-SED) (the

current CDE designee to provide administrative review mandated under the IDEA, effective July

1, 2005), alleging that the AUSD denied the Student a FAPE during the 2003-2004, 2004-2005,

2005-2006 and 2006-2007 school year by failing to provide the Student with the services set

forth in the IEP.

28.    The Student and his Parents are aggrieved parties, pursuant to 42 U.S.C. § 1415 of

the IDEA, regarding a decision and order issued by a hearing officer for the OAH-SED.

(Exhibit A hereto). The hearing officer erred as a matter of law when the dismissed the Student's

IDEA claims that the AUSD denied the Student a FAPE for the 2003-2004, 2004-2005, 2005-

2006, 2006-2007  failing to provide the services and consideration promised.

29.    The Student and his Parents further are aggrieved by the hearing officer's order to

the extent the decision denies them the right to prove that the AUSD denied the Student a FAPE

and to the extent the Student and his Parents would be unable to recover attorney fees as a

prevailing party for the AUSD's denial of a FAPE to the Student.

30.    The AUSD has knowingly and deliberately manipulated the administrative review

process to deny the Student a FAPE as appropriate and necessary

9

31.    The AUSD Board and Superintendents Nashino and Dailey have failed to adopt policies, procedures and practices, or take necessary measures to ensure that AUSD provides the Student with the services.

32.    The SPED Directors and Former Director Wax have failed to take appropriate measures to comply with the CDE order and fulfill AUSD's obligations under the IEP.

33.    Based upon information and belief, the defendants and each of them have ignored their obligations to the Student under IDEA because the Student has a disability and his Parents have actively advocated for the Student's rights by seeking redress through the process required under the IDEA.

34.    Superintendents Nashino and Dailey failed to adequately supervise SPED Directors and Former Director Wax and failed to ensure that either took appropriate measures to provide the Student with the services as outlined in the IEP.

35.    The State Defendant failed to monitor the AUSD failure and continuing failure to provide the Student with the services described in the IEP. The State Defendant has failed to bring any action to enforce the requirements of the IDEA or ensure the AUSD's compliance with the IEP.

36.    The State Defendant has failed to adopt procedures and practices or take necessary measures to ensure that AUSD fulfills obligations under the IDEA to resolve claims of denials of a FAPE. The State Defendant has enabled the AUSD to commit ongoing violations of the due process rights prescribed under the IDEA, including the Student's rights, by denying mandated relief for prospective denials of a FAPE caused by AUSD.

37.    The Student and his Parents have exhausted their administrative remedies by attempting to obtain enforcement of and compliance with the IEP. Further attempts to redress the denials of a FAPE to the Student for the 2003-2004, 2004-2005, 2005-2006 and 2006-2007 school years is excused because to do so would be futile given the Parents failed efforts and will

10

1  accomplish nothing other than further delay the Student and his Parents from obtaining the relief

2  for the AUSD's denial of a FAPE to the Student.

3  ## FIRST CLAIM FOR RELIEF
**(Violation of Individuals with Disabilities Education Act,**

4  **20 U.S. Code §§1400 *et seq.* – Against All Defendants)**

5      38.    Plaintiffs reallege and incorporate by reference, as though fully set forth herein,

6  all preceding paragraphs of this Complaint.

7      39.    The purpose of the IDEA is to ensure that all children with disabilities have

8  available to them a free appropriate public education that emphasizes special education and

9  related services designated to meet their unique needs and to ensure that the rights of children

10  with disabilities and parents of such children are protected.

11      40.    The Defendant's acts and missions are alleged herein violated the intent and

12  purpose of the IDEA. The acts of the Individual Defendants, and each of them, as alleged herein,

13  were willful, wanton, malicious, and oppressive, and justify the awarding of punitive damages.

14  Plaintiffs were damaged as a result of said acts and omissions.

15      41.    Plaintiffs seek all available remedies afforded to them for violations of the IDEA,

16  including, but not limited to, compensatory education, reimbursement, injunctive relief and

17  attorney fees and costs.

18      42.    The IDEA includes an express, unequivocal abrogation of immunity under the

19  Eleventh Amendment pursuant to 20 U.S.C. § 1403 which was enacted pursuant Congress'

20  powers under § 5 of the Fourteenth Amendment of the United States Constitution.

21      43.    Plaintiffs exhausted their administrative remedies as alleged herein by: continuing

22  meet and confer efforts with AUSD and its representatives; continuing to attempt to resolve the

23  AUSD's denial of services, compensatory services and reimbursement had not been resolved;

24  filing a complaint, pursuant to 20 U.S.C. § 1415, with the Office of Administrative Hearings-

25  Special Education Division; and exhausting said complaint when the OAH-SED decided the

11

1  case; Further administrative attempts to redress Defendants' IDEA violations is excused because

2  to do so would be futile and/or offers inadequate relief. Alternatively, further administrative

3  attempts to redress Defendants' IDEA violations is excused because the Defendants have

4  adopted a policy and/or pursued a practice of general applicability that is contrary to the law.

5      44.    The acts and omissions giving rise to the Plaintiff's injuries as alleged herein

6  could have been redressed by the IDEA's administrative procedures and remedies had

7  Defendants, and each of them, complied with the CDE's findings as alleged herein.

8      45.    Plaintiffs' efforts, as alleged herein, gave Defendants, and each of them, full

9  exploration of technical educational issues, and provided Defendants the first opportunity to

10  correct shortcomings in their educational programs for the Student in order to ascertain and

11  alleviate the problems alleged herein to no avail.

12      WHEREFORE, Plaintiffs pray for relief as hereinafter provided.

13                          **SECOND CLAIM FOR RELIEF**
                    **(42 U.S.C. Section 1983 -  Violation of Individuals**
14              **with Disabilities Education Act, 20 U.S. Code §§1400 *et seq.*)**

15  **[Count One – Prospective Injunctive Relief  Against Defendant Superintendent O'Connell**
                **and Individual Defendants in Their Official Capacities]**
16

17      46.    Plaintiffs reallege and incorporate by reference, as though fully set forth herein,

18  all preceding paragraphs of this Complaint.

19      47.    The IDEA gives disabled students a substantive right to public education and

20  conditions federal assistance upon a State's compliance with the substantive and procedural

21  goals of the Act. 42 U.S.C. § 1983 is a generally and presumptively available remedy for claimed

22  violations of federal law.

23      48.    Congress added § 1415(f) to the Education of the Handicapped Act ("EHA")

24  (IDEA's predecessor) as part of the Handicapped Children's Protection Act of 1986.  In adding

25  Section 1415(f) to IDEA in 1986, Congress specifically authorized legal actions predicated on

the IDEA.  As amended, 20 U.S.C.A. § 1415 provides that:

12

"(f) Effect on other laws

Nothing in this chapter shall be construed to restrict or limit the rights, procedures, and remedies available under the Constitution, title V of the Rehabilitation Act of 1973 [ ], or other Federal statutes protecting the rights of children and youth with disabilities, except that before the filing of a civil action under such laws seeking relief that is also available under this subchapter, the procedures under subsections (b)(2) and (c) of this section shall be exhausted to the same extent as would be required had the action been brought under this subchapter.

49.    The Individual Defendants and Defendant Superintendent O'Connell acted under color of state authority while engaging in the acts and omissions which Plaintiffs contend violate the provisions of the IDEA as alleged herein.

50.    The Individual Defendants' and Defendant Superintendent O'Connell's acts and omissions as alleged herein violated the intent and purpose of the IDEA. Alternatively, Defendants' acts and omissions as alleged herein violated the Student's constitutional substantive right to public education and/or his property interest found in California's Education Code §§ 56500 et seq.

51.    Plaintiffs were harmed and continue to be harmed as a result of said acts and omissions. As a direct and proximate result of the acts and omissions alleged in this Complaint, the Student and his Parents will continue to be damaged and suffer irreparable harm unless the Defendants are enjoined. Plaintiffs seek all available prospective injunctive relief afforded to them for violations of the IDEA.

WHEREFORE, Plaintiffs pray for relief as hereinafter provided.

**[Count Two – Retrospective and Monetary Relief Against Individual Defendants in Their Individual Capacities]**

52.    Plaintiffs reallege and incorporate by reference, as though fully set forth herein, all preceding paragraphs of this Complaint.

13

53.    The Individual Defendants acted under color of state authority while engaging in the acts and omissions which Plaintiffs contend violate the provisions of the IDEA as alleged herein.

54.    The Individual Defendants' acts and omissions as alleged herein violated the intent and purpose of the IDEA. The acts of the Individual Defendants, and each of them, as alleged herein, were willful, wanton, malicious, and oppressive, and justify the awarding of punitive damages.

55.    Plaintiffs were damaged and continue to be damaged as a result of said acts and omissions. Plaintiffs seek all available retrospective and monetary relief afforded to them for violations of the IDEA.

WHEREFORE, Plaintiffs pray for relief as hereinafter provided.

### THIRD CLAIM FOR RELIEF

**(Violation of Section 504 of the Rehabilitation Act of 1973,
29 U.S. Code §794 – Against All Defendants)**

56.    Plaintiffs reallege and incorporate by reference, as though fully set forth herein all preceding paragraphs of this Complaint.

57.    The Student is disabled as defined by Section 504 of the Rehabilitation Act of 1973. The Student is "otherwise qualified" to participate in school activities in the District. The District Receives federal financial assistance.

58.    The Defendants' acts and omissions as alleged herein violated Section 504 of the Rehabilitation Act of 1973 by preventing the Student from participating fully in the educational opportunities available in the District and/or was subject to discrimination as a consequence of his disability and/or in retaliation for his Parents' protected conduct in opposing said discrimination and petitioning for the Student's rights.

59. The Defendants, and each of them, intentionally discriminated against Plaintiffs and/or were deliberately indifferent to Plaintiff's federally protected rights. The acts of the

14

Individual Defendants, and each of them, as alleged herein, were willful, wanton, malicious, and oppressive, and justify the awarding of punitive damages.

60.  Plaintiffs were damaged as a result of said acts and omissions.  Plaintiffs seek all available remedies afforded to them for violations of Section 504 of the Rehabilitation Act of 1973.

61.  Section 504 of the Rehabilitation Acct of 1973 includes an express, unequivocal abrogation of the immunity under the Eleventh Amendment pursuant to 42 U.S.C. § 2000d-7(a)(1) which was enacted pursuant to Congress' powers under § 5 of the Fourteenth Amendment of the United States Constitution.

WHEREFORE, Plaintiffs pray for relief as hereinafter provided.

## FOURTH CLAIM FOR RELIEF

**(42 U.S.C. Section 1983 – Section 504 of the Rehabilitation Act of 1973, 29 U.S. Code §794)**

**[Count One – Prospective Injunctive Relief Against Defendant Superintendent O'Connell and individual Defendants in their Official Capacities]**

62.  Plaintiffs reallege and incorporate by reference, as though fully set forth herein, all preceding paragraphs of this Complaint.

63.  Section 504 of the Rehabilitation Act of 1973 prohibits the denial of the benefit of any services, programs, or activities provided by the District on the basis of disability.  42 U.S.C. § 1983 is a generally and presumptively available remedy for claimed violations of federal law.

64.  The Student is disabled as defined by Section 504 of the Rehabilitation Act of 1973. The Student is "otherwise qualified" to participate in school activities in the District.

65.  The Defendants' acts and omissions as alleged herein violated Section 504 of the Rehabilitation Act of 1973 by preventing the Student from participating fully in the educational opportunities available in the District and/or was subject to discrimination as a consequence of his disability and/or in retaliation for his Parents' protected conduct in opposing said discrimination and petitioning for the Student's right.  The Defendants, and each of them,

15

1 intentionally discriminated against Plaintiffs and/or were deliberately indifferent to Plaintiffs'

2 federally protected rights.  Plaintiffs were damaged as a result of said acts and omissions.

3 Plaintiffs seek all available remedies afforded to them for violations of Section 504 of the

4 Rehabilitation Act of 1973.

5       66.    The Individual Defendants acted under color of state authority while engaging in

6 the acts and omissions which Plaintiffs contend violate the provisions of Section 504 of the

7 Rehabilitation Act of 1973 as alleged herein.

8       67.    The Individual Defendants' acts and omissions as alleged herein violated the

9 intent and purpose of Section 504 of the Rehabilitation Act of 1973.  Alternatively, Defendants'

10 acts and omissions as alleged herein violated the Student's constitutional substantive right to

11 public education and/or his property interest in a public education.  The denial of the opportunity

12 to participate fully in the education al opportunities available in the District and/or the

13 discrimination he was subjected to as a consequence of his disability affects the Student's ability

14 to complete his education as well as success in getting into college.  Alternatively, the denial of

15 the opportunity to participate fully in the educational opportunities available in the District in

16 retaliation for his Parents' protected conduct in opposing said discrimination and petitioning for

17 the Student's rights violated Plaintiffs' constitutional rights.

18       68.    Plaintiffs were harmed and continue to be harmed as a result of said acts and

19 omissions.  Plaintiffs seek all available prospective injunctive relief afforded to them for

20 violations of Section 504 of the Rehabilitation Act of 1973.  As a direct and proximate result of

21 the acts and omissions alleged in this Complaint, the Student and his Parents will continue to be

22 damaged and suffer irreparable harm unless the Defendants are enjoined.

23       WHEREFORE, Plaintiffs pray for relief as hereinafter provided.

24

25

16

**[Count Two – Retrospective and Monetary Relief Against**

**Individual Defendants in Their Individual Capacities]**

69.    Plaintiffs reallege and incorporate by reference, as though fully set forth herein, all preceding paragraphs of this Complaint.

70.    The Individual Defendants acted under color of state authority while engaging in the acts and omissions which Plaintiffs contend violate the provisions of Section 504 of the Rehabilitation Act of 1973 as alleged herein.

71.    The Individual Defendants' acts and omissions as alleged herein violated the intent and purpose off Section 504 of the Rehabilitation Act of 1973.  The acts of the Individual Defendants, and each of them, as alleged herein,, were willful, wanton, malicious, and oppressive, and justify the awarding of punitive damages.  Plaintiffs seek all available retrospective and monetary relief afforded to them for violations of Section 504 of the Rehabilitation Act of 1973.

WHEREFORE, Plaintiffs pray for relief as hereinafter provided.

**FIFTH CLAIM FOR RELIEF**
**(42 U.S.C. Section 1983 – Violation of the Due Process Clause of the**
**Fourteenth Amendment Against Individual Defendants in Their Individual Capacities)**

72.    Plaintiffs reallege and incorporate by reference, as though fully set forth herein, all preceding paragraphs of this Complaint.

73.    The Fourteenth Amendment forbids the State from depriving any person of life, liberty, or property without due process of law.  The State of California created a property interest in public education for disabled students with exceptional needs to receive certain benefits as set forth in California's Education Code §§ 56500 et seq.

74.    Having chosen to extend the right to an education to people of the Student's class, the State is constrained to recognize a student's legitimate entitlement to the benefits bestowed pursuant to California Education Code §§ 56500 et seq., as a property interest which is protected

17

by the Due Process Clause and which may not be deprived without adherence to the minimum

procedures required by that Clause.  The deprivations to the Student's of the benefits as alleged

herein are not de minimis and constitute a serious event in the life of the Student and effects the

Student's ability to complete his education as well as success in getting into college.

75.      The Student was deprived of this property interests as alleged herein without

being afforded notice and opportunity for hearing appropriate to the nature of the case,

particularly in the decision by the OAH-SED to make a decision against the Plaintiffs

concerning the 2003-2007.  The Plaintiffs were deprived of the fundamental requisites of due

process of law by being denied of the opportunity to be heard and to contest the deprivation of

the Student's property interest as alleged herein.  The acts of the Individual Defendants, and each

of them, as alleged herein, were willful, wanton, malicious, and oppressive, and justify the

awarding of punitive damages.

WHEREFORE, Plaintiffs pray for relief as hereinafter provided.

///

///

///

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray that this Court:

1.    For special and economic damages according to proof;

2.    For general and non-economic damages according to proof;

3.    For punitive damages against the Individual Defendants in their individual capacities for those claims in which they are available where the conduct is willful, wanton, malicious, and oppressive, according to proof;

4.    For prejudgment interest at the prevailing legal rate;

5.    For injunctive relief as described herein, to wit:

    (a)    That the Plaintiffs be made whole and afforded all benefits attendant thereto that would have been afforded Plaintiffs but for the wrongful conduct alleged herein;

    (b)    That Defendants, their agents, successors, employees, and those acting in concert with them be enjoined permanently from engaging in each of the unlawful practices, policies, usages, and customs set forth herein.

6.    For costs of suit including reasonable attorneys' fees; and

7.    For such other and further relief as the Court may deem proper.

Dated: September 17, 2007    Respectfully submitted,
TAYLOR, GOINS & STALLWORTH LLP

By: _____

VERNON C. GOINS II
Attorneys for Plaintiffs
LINDA PEDRAZA and FRANCISCO PEDRAZA,
individually and as guardians ad litem on behalf of
their son MICHAEL PEDRAZA

19

# Exhibit B

BEFORE THE
OFFICE OF ADMINISTRATIVE HEARINGS
SPECIAL EDUCATION DIVISION
STATE OF CALIFORNIA

In the Matters of:

STUDENT,

              Petitioner,

v.

ALAMEDA UNIFIED SCHOOL DISTRICT,

              Respondent.

OAH CASE NO. N2006090010

---

ALAMEDA UNIFIED SCHOOL DISTRICT,

              Petitioner,

v.

STUDENT,

              Respondent.

OAH CASE NO. N2006100365

---

STUDENT,

              Petitioner,

v.

ALAMEDA UNIFIED SCHOOL DISTRICT,

              Respondent.

OAH CASE NO. N2006100740

**DECISION**

Charles Marson, Administrative Law Judge, Office of Administrative Hearings, Special Education Division, State of California, heard this matter on April 2-6 and 17-20, 2007, in Alameda, California.

Petitioner's mother (Mother) represented Petitioner (Student). Mother was present throughout the hearing. Student's father (Father) was briefly present on April 6, 2007, in response to a District subpoena, but did not testify.

Karen E. Samman, Attorney at Law, represented Respondent Alameda Unified School District (District). Tamra J. Kaufman, Attorney at Law, also appeared for the District on April 2-7, 2007. Rosalind Davenport, the District's Director of Special Education, was present throughout the hearing, except on the afternoon of April 20, 2007, when Elizabeth Kowal, Program Specialist, was present for the District.

Student filed his request for due process hearing in Case No. N2006090010 on August 31, 2006. The District filed its request for due process hearing in No. N2006100365 on October 10, 2006. On October 18, 2006, Student moved to consolidate the two matters. On November 1, 2006, OAH consolidated the two matters and granted a continuance to conform the timeline for the two consolidated matters to that of No. N2006100365, the later-filed case.

Student filed his second request for due process hearing in Case No. N2006100740 on October 19, 2006, and moved to consolidate all three matters. On November 22, 2006, OAH consolidated the three matters and granted a continuance to conform the timeline for the three consolidated matters to that of No. N2006100740, the last-filed case.

At hearing, oral and documentary evidence were received. On April 6, 2007, the parties were granted a continuance until April 17, 2007. On April 20, 2007, the parties were granted a continuance for submission of a declaration and briefs. Closing briefs were filed on May 14, 2007, whereupon the matter was submitted.

## ISSUES

1.     Were the District's triennial assessments of Student in September, October, and November 2005 inaccurate?

2.     Should the District have reimbursed Parents for an Independent Educational Assessment (IEE)[1] conducted by Dr. Allison Lowy Apple?

3.     Did the District deny Student a free appropriate public education (FAPE) in the school year (SY) 2004-2005 by failing to provide him behavioral services,[2] occupational therapy

---

[1] An "assessment" in California law is the same as an "evaluation" in federal law. (Ed. Code, § 56303.) The federal abbreviation for independent educational evaluation (IEE) is used herein.

(OT) services, and speech and language (S/L) services in conformity with his June 7, 2004 individualized education program (IEP) and its January 5, 2005 Addendum?

4.    Did the District deny Student a FAPE in SY 2005-2006 by:

A.    Failing to provide him behavioral services, OT services, and S/L services in conformity with his June 7, 2004 IEP and its January 5, 2005 Addendum, or

B.    Violating the procedural requirements of IDEA by failing to hold an IEP meeting until January 6, 2006; not providing to Parents copies of triennial assessment reports before the January 6, 2006 IEP meeting; failing to provide timely notice of the termination by Consultants for Learning and Autism Support Services (CLASS) of its behavioral services; not making an offer of placement to Student at the January 19, 2006, and February 14, 2006 IEP meetings; not having a representative of the proposed behavioral services provider Stepping Stones present at the February 14, 2006 IEP meeting; or offering at the March 20, 2006 IEP meeting to place Student at Haight Elementary School, but not allowing Parents to observe this placement until June 8, 2006, when no children were present?

5.    Did the District deny Student a FAPE in SY 2006-2007 by failing to provide him behavioral services, OT services, and S/L services in conformity with his June 7, 2004 IEP and its January 5, 2005 Addendum?

6.    Did the District violate the procedural requirements of IDEA in SY 2006-2007 by refusing to convene an IEP meeting from June 20, 2006, to the present?

7.    Did the District offer Student a FAPE for SY 2006-2007 by offering to place him in the Special Day Class (SDC) at its Haight Elementary School, and offering related services and supports?

8.    Is Student entitled to relief by reimbursement of Parents for costs of behavioral, OT, and S/L services; compensatory education in the areas of behavioral, OT, and S/L services; reimbursement of the costs of Dr. Allison Lowy Apple's IEE; or an order requiring the immediate convening of an IEP meeting?[3]

## CONTENTIONS OF THE PARTIES

Student, who is autistic, contends that the District's triennial assessments of him conducted in September, October, and November 2005 were inaccurate, and seeks

---

[2]   Student's requests for due process hearing address behavioral services, behavioral supervision, and behavioral consultation separately. However, at hearing, Student treated them as a single service, and they are so treated here.

[3]   Student also requested an order that the District fund assessments by Dr. Marilyn Buzolich in the areas of Assistive Technology and Augmentative and Alternative Communication, and provide Student such technologies as she recommends. However, Student made no mention of this issue at hearing, and it is not addressed further here.

reimbursement for an IEE by Dr. Allison Lowy Apple that Parents allegedly obtained because they disagreed with the District's assessments. The District contends that its assessments were accurate, and that the Lowy Apple IEE was conducted before its assessments, and therefore could not have been sought because of disagreement with those assessments.

Student contends that from the beginning of SY 2004-2005 to the present, the District failed to provide him behavioral services and behavioral program supervision, OT services, and S/L services in conformity with his June 7, 2004 IEP and its January 5, 2005 Addendum. The District contends that each service was provided at District expense, or could not be provided due to Parents' obstruction and lack of cooperation. The District contends that Parents obstructed its delivery of services by rejecting District-funded providers, unilaterally terminating them, failing to cooperate with them, and attempting to control their qualifications and programs to an extent unacceptable to them.

Student contends that the District significantly impeded Parents' opportunity to participate in the decision-making process by failing to hold timely IEP meetings, timely provide assessment reports, timely notify them of the decision of a behavioral services provider to terminate its services, make a placement offer, secure the attendance of a behavioral specialist at an IEP meeting, or allow timely inspection of the proposed placement. The District responds that it arranged for the triennial IEP meeting as soon as practicable, appropriately provided assessment reports at the first triennial meeting, promptly notified Parents of the service provider's decision to terminate its contract, made an offer of placement at the first triennial IEP meeting and restated it thereafter, did not need a representative of the proposed behavioral services provider at the meeting, and did not delay Parents' inspection of the proposed placement. It argues that there was no reason to hold an IEP meeting after June 2006, as the parties had reached an impasse and Parents only sought to continue restating disagreements already thoroughly aired. Finally, it asserts that none of these alleged procedural shortcomings had any significant effect on Parents' right to participate in the decision-making process, or on Student's education.

The District contends that Student, who is now in a fully inclusive preschool, is too old for preschool and requires a small, highly structured, specialized class taught by experts in autism. The District argues it offered a FAPE to Student for SY 2006-2007 by offering him placement in its Haight Elementary School SDC for autistic children, which integrates behavioral, OT, and S/L services, among others. Student, who is approaching eight years of age, contends that he is prospering in a fully inclusive private preschool otherwise attended by children aged two to five; that the District should continue to fund his placement there; and that the offered SDC placement is inappropriate because it uses the wrong teaching method and is not fully inclusive.

## FACTUAL FINDINGS

*Background*

1.    Student is seven years old and resides with Parents in the District. He is eligible for, and has been receiving, special education and related services because of autistic-like

4

behaviors. He displays significant speech, language, and sensory processing delays and lacks social skills. His preacademic skills approximate those of a typically developing three year old. He is capable of one to two word utterances, mostly in response to prompts. He scores in the first percentile on cognitive and other tests, and functions within the range of the mentally retarded.

2.      Student's Parents placed him in Son-Light Preschool (Son-Light), a private, church-affiliated full inclusion program in Oakland, when he was two years old. He has attended the school for five years and by parental choice still does, though he is approaching eight years of age and his classmates range from two to five. The District previously reimbursed Parents for Student's tuition and one-to-one aide at Son-Light, but is no longer willing to do so because it believes he is too old for preschool and belongs in an SDC for autistic children.

*The last agreed-upon and implemented IEP*

3.      On June 7, 2004, the parties met to determine Student's program for the upcoming school year. The District and Parents agreed that Student would continue to attend Son-Light for three hours every school day, accompanied by a full-time one-to-one adult aide. The parties agreed to the provision of individual S/L service for 60 minutes three times a week; individual OT for 60 minutes twice a week; 540 minutes a week of behavioral services at home; and 60 minutes a week of behavioral services supervision at home or school. The June 7, 2004 IEP is Student's last agreed-upon and implemented IEP. He received special education and services pursuant to its terms throughout SYs 2004-2005 and 2005-2006.

*The District's Triennial Assessments*

*The psychoeducational assessment by Ilana Novak*

4.      The parties met on August 29, 2005, and agreed upon a plan for assessing Student for his triennial review on January 5, 2006. Pursuant to that plan, Ilana Novak, the District's school psychologist, completed a psychoeducational assessment of Student on October 11, 2005. Novak has worked for the District for 27 years and has assessed between 2000 and 3000 students. She has a master's degree and a credential in school psychology, and is a licensed clinical psychologist. She lectures at California State University at Hayward, where she teaches cognition and the assessment of intelligence to graduate students. She has been a school psychologist for 30 years.

5.      As part of her assessment, Novak observed Student at home and preschool, and interviewed Mother. She administered the DASI-II (Developmental Activities Screening Inventory) and Piagetian Activities to Student, the ABAS (Adaptive Behavior Assessment System)(teacher and parent respondents), the GARS (Gilliam Autism Rating Scale)(parent respondent) and the Vineland-II Adaptive Behavior Scales (parent respondent). She found that Student was functioning at the pre-conceptual thought level on Piaget's developmental scales, and that he had severe delays in all areas of language and in visual-motor integration. The ABAS revealed that Student was in the lowest first percentile among his peers in adaptive skills.



The Vineland-II yielded similar results. Novak concluded that Student needs "close monitoring and supervision in all settings and at all times."

6.     Overall, Novak determined, Student's cognitive ability is at the first percentile relative to children his age, and he is equally delayed in language development and adaptive behavior. She reported that he "functions within the mentally retarded range," and will need "intensive" services in a "highly structured and predictable setting." Novak concluded that Student needed a program "specially designed for students with Autism and multiple delays."

7.     Novak's findings were consistent with previous assessments. In October 2002, when Student was three, psychologist Tom Mushaney and a team at the Woodstock Child Development Center estimated that there were 50 percent delays in Student's overall developmental level compared to his chronological age. In October and November 2003, Dr. Carina Grandison, a developmental neurophysiologist, reached similar conclusions.

### The speech/language assessment by Valerie Coleman

8.     The District's S/L pathologist Valerie Coleman, who holds a master's degree in that specialty, completed a S/L assessment of Student on October 12, 2005. Coleman sought Student's participation in testing for two hours, but he would not sit still for more than ten seconds, attend to any picture stimuli, or engage in any activities with her. She then assessed him by observation and review of caregivers' reports, which, she stated, are valid indicators of S/L abilities. In the area of receptive language, Coleman found that Student could follow simple one step directions such as "wash hands" and "put on shoes," could recognize color words, his name, and all the letters of the alphabet, and could point to a named object or picture when told to "show me." However, he did not respond to greetings or requests from strangers, give appropriate eye contact, initiate conversation, or respond to other children's play requests. In the area of expressive language, he could label animals, colors, numbers, and letters in response to verbal prompts; hum to his favorite book; vocalize, laugh, and squeal to show pleasure; and yell, grunt, or scream to show displeasure. He rarely initiated spontaneous language, used only one or two word utterances, and had a spoken vocabulary limited to common everyday items or names he has been taught. He made his desires known by gestures, or by tugging on an adult. Coleman recommended continued S/L therapy using "a more structured communication system such as the Picture Exchange Communication System (PECS)."

### The occupational therapy assessment by Judith Auston

9.     The District's occupational therapist Judith Auston completed an OT assessment of Student on November 3, 2005. Auston has a master's degree in OT and is a licensed occupational therapist who had worked for the District for seven years. Before that she worked for another district for nine years. She has more than 25 years' experience delivering OT services to children in schools, including many autistic children. She was on Student's original assessment team when he was two years old. In her 2005 triennial assessment, she attempted to use standardized testing, but Student would not maintain eye contact or give her his attention, so she relied on observing him in the individual tutoring room of his preschool. She found significant sensory processing delay. His fine motor skills appeared to be within functional

range. In the area of gross motor skills he was very active, and demonstrated a sensory seeking need for proprioceptive, vestibular, and oral motor input. He had a chew toy on a string around his neck, which he used consistently during seated activities and which gave him focus. Auston testified that Student had needs in both fine and gross motor areas, and that his sensory needs were most evident because he became very agitated if they were not met. Auston recommended OT two times a week for 30 minutes a session.

*The assistive technology assessment by Lois Sonneman*

10.    Lois Sonneman, a District S/L pathologist, conducted an assistive technology (AT) assessment of Student on October 24, 2005. Sonneman has been a S/L pathologist for the District for 15 years since receiving her master's degree. She also has a credential and a master's degree in teaching the deaf and blind, and has taught them at the California School for the Blind and the San Francisco Unified School District. Ten years ago, Sonneman became involved in augmentative communication for preschoolers (of which AT is an important part) and acquired a mentor in AT. Since then she has attended many courses and workshops in AT, and completed numerous AT assessments.

11.    Mother requested the AT evaluation because she wanted Student to read better on the computer, and had noticed he had trouble using the computer mouse. Sonneman observed Student using the computer at preschool. She found that he could press the keys that spelled the letters of his name if given color-coordinated cards with the letters in order, but that he frequently held a key down too long. She recommended use of an alternative keyboard that records a single stroke even if a key is held down. She saw that Student did not make reference to the computer monitor or react to its display, and recommended Intellitalk 3, a talking word processing program that speaks letters and words as they are typed. She observed that while Student could click a mouse, he could not drag or color objects, and she recommended daily practice with a simple coloring exercise, and use of a printer to visually display the completed product. She saw that Student could interact with two compact disk (CD) programs for toddlers, and recommended that he be given Living Books CDs to help him read on the screen.

*The preacademic skills assessment by Valerie Abad*

12.    Valerie Abad, a District resource specialist, assessed Student's preacademic skills. She reported on October 12, 2005, that his preacademic skills were significantly delayed, greatly affecting the development of language-based concepts critical to academic readiness. He had some rote skills such as counting, but did not understand what numbers correspond to. He could name some letters but did not know the alphabet. He could not write any letter in his name, though he could trace dots for the vertical lines forming his name. Abad concluded that Student "would benefit from a small supportive environment focused on language and social development."

*Student's criticisms of the District's assessments*

13.    Student makes no specific criticism of any of the District's assessments, or of the qualifications of its assessors, and no evidence showed that any of the assessments failed to comply with the requirements of law. (See Legal Conclusions 9-10.)

14.    Student makes the conclusory allegation that the assessments did not accurately reflect his "intellectual functioning," but produced no proof to support that allegation.

15.    Student argues that the assessments did not state how he "needed to be worked with in the future." The law does not require that they do so. (See Legal Conclusions 9-10.)

16.    Student argues that the assessments failed to provide recommendations for the frequency and duration of services, but those are requirements of an IEP, not an assessment. (See Legal Conclusion 25.)

17.    Student did not prove that the District's assessments were inaccurate.[4] It is unnecessary to decide affirmatively that the assessments were appropriate, because the District, in No. 2006100365, did not seek that relief. (See Legal Conclusion 35.)

*Independent Educational Assessment (IEE)*

18.    At Student's triennial IEP meeting on January 5, 2006, each of the assessors presented her findings. Parents did not welcome the findings. They disagreed strenuously with school psychologist Novak's finding that Student was, in comparison to typically developing peers, at the first percentile in cognitive ability, and "functions within the mentally retarded range." Parents did not specifically challenge other portions of the assessments, but announced that they disagreed with all the assessments and wanted an IEE. The District agreed to pay for one.

19.    The IEE, for which Parents seek $3,880.48 in compensation, was conducted by Dr. Allison Lowy Apple, a behaviorist in the State of Washington. Lowy Apple attended the triennial IEP meeting on January 5, 2006, by telephone. She was introduced by Mother not in her professional capacity, but as a friend who was helping the family. Mother testified that Parents did not retain Lowy Apple for the IEE until after January 23, 2006. Mother conceded that Lowy Apple knew Student, and had talked to Parents about "what [Student's] needs were" before the IEE was requested, but testified that the actual IEE was not "conducted and completed" until March 2006. That testimony was not credible for the reasons that follow.

20.    Lowy Apple's assessment was conducted and completed before Parents knew anything about the District's assessments. Only the cover page of Lowy Apple's assessment was

---

[4] Student's contention that the proposed goals and objectives are inappropriate rests entirely on the assertion that they are based on inaccurate assessments. Because the assessments are not inaccurate, that contention also fails.

8

introduced in evidence.[5]  The date on the cover page is "March 2006," but the descriptions of observations and assessments show that Lowy Apple's work was conducted almost entirely in August 2005, before the District's assessments had even been planned. On August 11, 2005, Lowy Apple saw a video prepared by Mother of Student in his home and school settings. Also on August 15, Lowy Apple observed Student in his preschool setting, at home, and in the community, and administered the Vineland Adaptive Behavior Scales and the Social Skills Rating System. At various times in September, October, and November, Lowy Apple watched other videos prepared by Mother. No later activity is mentioned. Under the caption "Activity," the document is described as "Independent Evaluation," and under the caption "Reason for Referral," the document states that Mother "requested an independent evaluation."

21.    Mother's conduct was inconsistent with her claim that she did not request the IEE until after seeing the District's assessments. At the January 5, 2006 IEP meeting, the District offered a different placement for Student for SY 2006-2007 (see below). Parents refused to discuss that placement, or the goals drafted in conjunction with it, until they received an IEE. Theresa Anderberg, then the District's Director of Special Education, encouraged Mother to provide the credentials of anyone she wished to have considered as an independent assessor. A continuation of the meeting was scheduled for January 19.

22.    Mother testified that at the January 19, 2006 meeting she gave Lowy Apple's curriculum vitae to Anderberg, and proposed Lowy Apple as the independent assessor. Anderberg testified that Mother gave her Lowy Apple's curriculum vitae, but did not request that she be considered as a possible independent assessor, nor did she ever propose any specific assessor. Mother's subsequent conduct confirmed Anderberg's testimony. On January 23, three business days after allegedly proposing Lowy Apple as an assessor, Mother wrote to the District announcing that Parents intended to obtain an IEE at public expense and would submit bills for it. She requested that the IEP team reconvene on February 14 "to discuss the independent examiner's findings and program recommendations for [Student]." That schedule did not allow the District sufficient time to assess Lowy Apple's credentials, nor would it have allowed Lowy Apple sufficient time to conduct an assessment and produce a report. Instead, it suggested that the report already existed.

23.    At the February 14, 2006 IEP meeting, Parents did not mention having an IEE. They asked again for an IEE, but did not mention Lowy Apple, even when the District offered to employ Dr. Bryna Siegel of the Autism Clinic at the Medical Center of the University of California at San Francisco (UCSF) to do the IEE.  Parents stated that they would consider the District's offer to employ Siegel, and continued to insist that the proposed placement and related goals could not be discussed until an IEE was obtained. Another IEP meeting was scheduled for March 30.

24.    Mother testified that when she got no response from the District to her request that Lowy Apple be designated the independent assessor, she employed Lowy Apple independently. She did not so inform the District. On March 17, 2006, the District wrote to

_____

[5] Although Student was granted leave to allow Lowy Apple to testify by telephone from Washington, she was not called as a witness.



Parents, restating its offer to employ Siegel, and pointing out that Parents had not stated why they disagreed with the District's assessments. Parents did not immediately respond.

25. The IEP team reconvened on March 30, 2006. Again Mother did not mention Lowy Apple or her assessment. According to Anderberg, Mother told the IEP team that the family was still considering the District's offer of assessment at UCSF.[6] She stated that she did not show Lowy Apple's report to the District at the March 30 meeting because it was not yet "fully completed." This contradicted both her earlier testimony and the date on the cover page of the assessment.[7]

26. On May 21, 2006, the District wrote to Parents proposing two other possible assessors: Dr. Melanie Johnson of Novato, or Dr. Nancy Sullivan of the Children's Health Council in Palo Alto. Parents did not immediately respond, or mention Lowy Apple.

27. On July 20, 2006, Mother wrote to the District acknowledging the District's May offer of another assessor, but commented that the offer came months after Parents' request for an IEE, and reminded the District of the announcement in her January 23, 2006 letter that Parents would be seeking an outside assessor. Again she made no mention of Lowy Apple, or of the existence of her report. The District remained unaware of Lowy Apple's report until it was disclosed in Student's evidence binder five business days before the hearing.

28. At all relevant times, Mother was a prolific and articulate correspondent who did not hesitate to write letters and emails to the District whenever she perceived shortcomings in its behavior. However, there is no letter or email in the record showing that Mother ever mentioned her alleged request that Lowy Apple be designated the independent assessor. It is not plausible that she would have failed to communicate to the District her dissatisfaction that the District had not responded to her request concerning Lowy Apple, if she had actually made it in January, nor is it plausible that Mother would have entertained the District's suggestions of other potential assessors without mentioning her pending request.

29. The weight of evidence showed that Mother never requested that the District accept Lowy Apple as an independent assessor, never proposed any other independent assessor, and never accepted any assessor proposed by the District. By not naming Lowy Apple, Mother discouraged direct contact between Lowy Apple and the District, which would have revealed that the assessment was already completed. By failing to cooperate in selecting another assessor, Mother ensured that the District would not pay for an assessment by anyone else.

30. The weight of evidence showed that Lowy Apple's assessment was conducted before the District's assessments, and therefore could not have been requested or conducted due

---

[6] Mother denied making that statement, but the notes attached to the IEP mention the statement, and Mother did not challenge those notes when she received them shortly after the meeting.

[7] Mother testified that the IEE was not completed until she had the opportunity in June to inspect the District's proposed placement of Student in the Haight Elementary School SDC (see below). However, there was no connection between the completion of the Lowy Apple assessment and Mother's visit to the Haight SDC. Mother visited the SDC; Lowy Apple did not. Moreover, an IEE assesses a child's needs, not a proposed placement.



to any disagreement with the District's assessments. Parents are therefore not entitled to reimbursement for the Lowy Apple IEE.

*FAPE in SY 2004-2005*

31.    A district must deliver special education and services to a student in conformity with his IEP. Student contends that, during SY 2004-2005, the District failed to provide him behavioral, OT, and S/L services in conformity with his June 7, 2004 IEP and its January 5, 2005 Addendum.

*Behavioral Services in SY 2004-2005*

*LIFE*

32.    The parties agree that Student needs Applied Behavior Analysis (ABA) services, but have had difficulties finding a provider of ABA services acceptable to Parents. At the beginning of SY 2003-2004, Student was served by the Center for Autism and Related Disorders (CARD), but their services were ended due to disagreements with Mother. The District next offered services by the Foundation for Autistic Childhood Education and Support (FACES), but Parents did not complete that agency's intake process. The District offered services by the Behavioral Intervention Association (BIA), but Parents did not complete its intake process either. At an IEP meeting on March 17, 2004, the District offered services by the Lovaas Institute for Early Intervention (LIFE), but Mother stated that she preferred Behavior Analysts, Inc. (BAI). The District agreed to employ BAI, and prepared a contract for services from that agency. Mother executed a consent form for the sharing of confidential information between the District and BAI, but soon revoked it. BAI refused to proceed without parental consent for the release of information. The extent of actual delivery of behavioral services to Student during that school year is not clear from the record.

33.    At the June 7, 2004 IEP meeting, the District again offered the services of LIFE. Scott Cross, LIFE's clinical director, attended the meeting by telephone. Mother accepted the services of LIFE in writing. The District gave Mother LIFE's standard Information Packet, a lengthy document describing the agency's practices and expectations. Mother signed a form consenting to the District's release of confidential information to LIFE, and the District began to gather information for that purpose. LIFE requested certain information from the District, and Mother agreed to provide other information directly to LIFE.

34.    However, LIFE never provided direct therapy services to Student because Parents declined to complete its intake process. Cross, a board certified behavior analyst experienced in providing ABA services through LIFE and other agencies, described LIFE's intake process at hearing. Like similar agencies, LIFE relies on parents more than school districts to furnish information, even when a district is paying for its services, because parents know their child's complete history, will be involved in treatment, and care most about a favorable outcome. LIFE requires that parents complete an application form and supply a medical evaluation and numerous other documents. It also requires completion by parents of an extensive intake form,

11

which asks numerous questions about Student's parents and family, his developmental history, his known history of treatment, and possible arrangements for parental participation in treatment. Then LIFE schedules an extensive intake interview with parents, and an observation of the child. Finally, the agency requires that parents sign a contract. LIFE has never accepted a child as a client without the completion of these intake procedures.

35.    On June 10, 2004, Mother wrote to Cross, enclosing "a packet of information for your perusal." Mother then asked Cross fifteen questions about LIFE's services, so that Parents could "determine if your agency will be a good match for our son's needs." On June 28, Cross responded, answering the questions in detail. Some of Cross's answers did not fulfill Mother's expectations. For example, Mother had asked whether LIFE would accept the recommendations and assessment of a previous consultant. Cross responded that while his agency would collaborate with any sound advice, it could not state that its recommendations would always coincide with another agency. And in response to Mother's request for three family references, Scott stated that references were not typically sought from families in order to preserve confidentiality and avoid the perception of pressuring clients.

36.    At some time in June 2004, LIFE sent its intake form to Parents, and encouraged them to contact its regional intake coordinator, Meghan Brearley, to advance the intake process. Mother responded on June 30 by requesting that Cross explain the purpose of the intake form. Cross replied on June 30 that the form was "the first step in the intake process that all of our families participate in," and that the form "allows us the opportunity to ask questions related to development in a variety of domains as well as assess family concerns."

37.    The exchange of emails on June 30 was the last documented contact between Parents and LIFE. Meghan Brearley told Cross that she never heard from Mother. The record does not show any further contact between Parents and the District, or between Parents and LIFE, concerning LIFE's services, nor does it show that Student received any behavioral services funded by the District between June and the beginning of SY 2004-2005.[8]

38.    SY 2004-2005 began in late August 2004. The record does not reveal whether Student was receiving behavioral services privately when the school year began. The District's offer of behavioral services by LIFE remained outstanding and accepted by Parents, but not implemented because Parents had not completed the intake process.

39.    There was no evidence that either Parents or LIFE advised the District before late November 2004 that the intake process remained uncompleted. Somehow the District learned of that fact, and attempted to arrange an IEP meeting in order to "offer" LIFE's services again. On November 22, the District invited Cross to the meeting. Cross agreed to attend, but advised the District that LIFE had no completed application from Parents. The IEP meeting was held on December 1, and Cross attended by telephone, but at that meeting Parents announced that they had hired a different provider, and LIFE was not discussed further. Services by the other provider began on December 6 (see below).

---

[8] Student's claim (in Case No. 2006090010) that the District denied him FAPE by failing to deliver promised services begins with SY 2004-2005, not earlier.

40.     Student makes three arguments to support his claim that LIFE's failure to deliver services from the beginning of SY 2004-2005 through December 5, 2004, was caused by the District. None is persuasive. First, Student claims that the "packet of information" requested of Mother on June 7, 2004, and sent by her to Cross on June 10, satisfied LIFE's need for an intake form. However, nothing in the record describes the packet of information. Cross acknowledged receipt of "the information packet" on June 17, but the June 30 exchange of emails between Mother and Cross shows that, on that day, Mother had the intake form, had not completed it, and asked Cross to explain why she had to fill it out and return it. Thus it is clear that the "packet of information" Mother sent on June 10 was not the intake form the agency required.

41.     Second, Mother testified at hearing that she would produce documentary evidence that she had been in contact with LIFE's regional intake coordinator Meghan Brearley. The only evidence produced shows that Mother sent a copy to Brearley of her June 30, 2004 email to Cross asking the purpose of the intake form. Student produced no evidence that any direct contact between Parents and Brearley occurred.

42.     Third, Student argues that the District failed to provide behavioral services because LIFE was not ready to begin service on June 7, 2004, and could not begin service until August first. Even if true, the argument would not support a claim that services were not provided after August first, or justify Parents' refusal to complete the agency's intake process. However, SY 2004-2005, the first school year at issue here, had not started by August first. Cross did state in a June email that "we envision" having clinical services available around August first, but the services offered by the District were of a different kind and were available immediately. As Cross explained at the June 7, 2004 IEP meeting, LIFE offers two kinds of service. In its "workshop model," families recruit individuals who do one-to-one therapy. They are trained and monitored by LIFE. In its "clinic-based model," LIFE provides the staff. Cross testified without contradiction that his agency could have delivered workshop model services on June 7.

43.     Mother testified that the District's offer at the June 7, 2004 IEP meeting was only for the clinical model, which could not have been provided until August. The District contends that the offer was only for the immediately available workshop model, and the weight of evidence supports its claim. The IEP itself was ambiguous; it offered LIFE for "behavior services." The IEP notes show that both models were discussed, and that the discussion focused more on the workshop model, since Mother was reported as saying she had staff already working with Student who needed training. On June 18, Jacqueline Cheong, Ph.D., the District's program specialist in SY 2004-2005, wrote to Parents stating that "LIFE's workshop model seems to be ideal for your particular needs" and that "the District is therefore ready, willing and able to facilitate the process so that the LIFE workshop model is up and running." There is no evidence that Parents claimed at the time that this was a misunderstanding. Cross's email stating "we envision" the availability of clinic-based services by August is not inconsistent with the District's offer of the workshop model. Cross explained he used that language because many of the agency's families started with the workshop model, and then made the transition to the clinic-based model.

13

44.    In any event, it was the District, not Cross, that defined its offer. The evidence showed that the District's offer was for the workshop model of services. That service model was immediately available. And it was Parents' failure to complete the intake process, not any staffing shortage at LIFE, that prevented the delivery of services in either model. Finally, no alleged service denial prior to the beginning of SY 2004-2005 in late August is at issue here.

45.    From the beginning of SY 2004-2005 in late August 2004, through December 5, any gap in behavioral services the District was obliged to provide under the June 7, 2004 IEP was caused exclusively by Parents' refusal to complete the intake process for LIFE. It was not caused by any act or omission of the District.

### CLASS

46.    The IEP team met on December 1, 2004, at Parents' request. Mother proposed that the District employ Consultants for Learning and Autism Support Services (CLASS) for behavioral services. Mother stated that Parents would hire CLASS to begin services on December 6 whether the District approved or not, and would hold the District responsible for the cost. The District was unfamiliar with CLASS, but investigated the agency and found it suitable. On December 6, the District wrote to Parents promising to contract with CLASS, which apparently began serving Student that day.

47.    The IEP team met again on January 5, 2005. A CLASS representative attended, and the team agreed upon a behavioral program for Student beginning that day. The IEP Addendum stated that CLASS would provide Student 25 hours a week of services in the home, 15 hours of support a week by a one-to-one aide at school, eight hours a month of supervision in the home, and four hours a week of consultation at school.

48.    Starting on December 6, 2004, and for the remainder of SY 2004-2005, CLASS provided to Student the behavioral services required by the June 7, 2004 IEP and its January 5, 2005 Addendum.

### Occupational therapy services in SY 2004-2005

49.    In California, a school district may finance outside special education services in one of two ways. If a service provider is a nonpublic agency (NPA) certified by the State, the district may contract directly with it. If it is not, the District may not contract directly with it, and can only reimburse parents for expenses incurred. (See Legal Conclusions 17-18.)

50.    In SY 2003-2004, Student received OT services from SUMA KIDS until Mother unilaterally terminated those services without informing the District. In April 2004, Mother retained the services of Rita Montez, an occupational therapist and independent contractor working for Mary Kowar & Associates (Kowar) of El Cerrito. Mother then proposed, at the June 7, 2004 IEP meeting, that the District provide OT services through Kowar, to be delivered by Kowar's independent contractor Montez. The District agreed, and offered to enter into a contract with Kowar so that it could pay Kowar directly.

51.    The District made several efforts to contract with Kowar. Cheong called Montez repeatedly, and once visited her, to propose a contract between the District and Kowar. However, Montez declined, on her own behalf and Kowar's, to enter into a contract. Montez testified that she herself was not an NPA, and did not work independently; she worked only as a contractor for Kowar and similar agencies. Montez also testified that Kowar's El Cerrito facility was not an NPA.

52.    Mother testified that Kowar was and is an NPA. She gave no explanation for her opinion, cited no source for it, and produced no evidence to support it. She admitted she was not familiar with that area of law. Montez's testimony was more persuasive than Mother's because Montez is a professional not involved in the current dispute, and is in a better position to know. Montez testified that she has worked as a contractor for Kowar for several years, and also for several other agencies, some of them NPAs and some not. As a result, she knew the difference, and she was confident Kowar in El Cerrito was not an NPA. A different kind of Kowar facility in San Diego had at some time been an NPA, but had been closed. The weight of evidence was that Kowar was not an NPA.

53.    Montez also testified that Kowar would not contract with the District because, as a separate matter of policy, the agency always insisted on receiving payment directly from parents. This would have prevented the District from contracting with Kowar whether it was an NPA or not.

54.    Having failed to contract with Kowar, the District repeatedly informed Parents, orally and in writing, that it could not obtain such a contract and would have to reimburse Parents if they wanted to use Kowar's services. The District also informed Parents that, if advancing payment to Kowar was too burdensome, as Parents kept claiming, there were two alternatives. The District could seek out a suitable NPA with which it could contract, and could therefore pay directly; or it could provide OT services in-house, from its own occupational therapist. Parents rejected these alternatives, continued to insist on using Kowar, continued to protest the requirement that they advance payments to Kowar and seek reimbursement, and continued to complain that the District would not contract with Kowar.

55.    From the beginning of SY 2004-2005 until April, 2005, Montez, working for Kowar, provided OT services to Student at Kowar's El Cerrito facility. Kowar billed Parents for the services, Parents paid Kowar, and Parents were fully reimbursed by the District, although at a slower pace than they desired. In April 2005, Mother unilaterally terminated Montez's services, stating that Parents could no longer afford to advance Kowar's fees. From April 2005, to the end of SY 2004-2005, Student received no District-funded OT services.

56.    Because Parents rejected the District's proposal that it search for an NPA with which it could contract to deliver OT services, the District did not pursue that alternative. However, the in-house alternative proposed by the District would have appropriately delivered the OT services required by the June 7, 2004 IEP and its January 5, 2005, addendum. The services would apparently have been delivered by Judith Auston (see above).

57.    Mother testified that Parents rejected the District's in-house alternative because Student needed services in a clinic; he needed services in a separate ("motor") room that the District did not have; and that any change in providers would be too disruptive. She sought support for this view from two documents. The first was an OT assessment by Montez, conducted in April and May 2004, which recommended that Student receive two hours a week of individual therapy, at least one hour of which was "to be provided in a clinic setting." The other was the June 7, 2004 IEP, which followed Montez's recommendation by offering two hours a week of OT, in "clinic and preschool."

58.    Auston testified that Student did not need services in a clinic or separate room. Her testimony was more persuasive than Montez's report, and the IEP that adopted it, for several reasons. First, Auston was substantially more experienced than Montez in the delivery of OT services to school children, including to autistic children. There was no evidence that Montez had any particular experience with autistic children.

59.    Second, Auston was more familiar with Student and in a better position to judge his progress over time. She had been on the team that assessed Student when he entered the District at two years of age. She had assessed him again in October 2005 in preparation for his triennial IEP meeting on January 5, 2006. That second assessment was a year and a half more recent than Montez's assessment, a significant time in the life of a child.

60.    Third, at hearing Auston persuasively defended her opinion that Student did not need true clinic-based services or treatment in a separate motor room. She had spoken to Montez about Kowar's El Cerrito facility, and did not believe it was really a clinic. She was told it was a house with OT equipment in it. A true clinic, Auston testified, is a medical facility, usually housed in a hospital and supervised by a physician. So the OT Student had been receiving from Kowar had never been truly clinic-based services.

61.    Fourth, Student produced no evidence to contradict Auston's opinion. Although Montez testified, she was not asked whether anything had changed since her spring 2004 assessment of student, whether Student still needed clinic-based services in April 2005 when her services ceased, or whether he needed them more recently. Nor was she asked whether Kowar's facility was truly a clinic.

62.    Finally, Student presented no evidence that the District's in-house facilities or equipment were inadequate, that the absence of a separate motor room would have any effect on Student's treatment or progress, or that Auston was not capable of delivering appropriate OT services. While it is true that, in April 2005, Student's outstanding IEP still required one hour of OT in a "clinic" setting, there was no evidence that the District's facilities were any less a "clinic" than Kowar's house in El Cerrito. There was no evidence, beyond Mother's unexplained lay opinion, that a change of providers would have been too disruptive for Student. It certainly would not have been as disruptive as having no OT provider at all, which was the result of Mother's conduct.

63.     Student was not provided any OT services from April 2005 to the end of SY 2004-2005 by the District because Parents refused to continue to pay Kowar and seek reimbursement,[9] continued to insist that the District contract with Kowar, and declined available alternatives. The failure to provide OT services during that period was not the result of any act or omission of the District.

*Speech and language services in SY 2004-2005*

64.     The parties agree that Student received S/L services throughout SY 2004-2005, but dispute whether the District was the entity that provided them. Student argues it was not, because Parents' health insurer paid for the services; therefore the District did not provide services in conformity with his IEP because the insurer provided them instead.

65.     The evidence showed that Student's S/L services at Children's Hospital of Oakland (CHO) were paid for by the insurer, not the District. The District made many efforts to substitute itself as the payor, but could not do so because Parents refused repeated requests to instruct the hospital to cease billing the insurer and bill the District instead. Without such an instruction, CHO was required to continue to bill the insurer.

66.     On Parents' arrival in the District, they obtained S/L services for Student from CHO. The service was delivered by S/L pathologist Mary Gage Herman in a clinic at CHO, and billed to Parents' insurer.

67.     At the June 7, 2004 IEP meeting, Parents accepted the District's offer of S/L services three times a week, 60 minutes a session, by Herman at CHO. The parties understood that the District, which already had a master contract with CHO (an NPA), would essentially assume financial responsibility for Student's current therapy at CHO. Herman attended the meeting and signed the attendance sheet as the attending speech pathologist. She proposed draft speech and language goals and objectives, which were edited and then approved by Parents and the District.

68.     Herman testified that Mother requested that CHO not bill the District for her services. Herman understood that the District wanted to receive the bill, but Mother told her that Parents had not signed the speech and language portion of the June 7, 2004 IEP (which was untrue), and that CHO was not to bill the District for her services.

69.     David Wax, Ph.D. (Wax), was the District's Director of Special Education in SY 2004-2005. He testified that the District wanted to pay CHO for Student's S/L services, and had prepared all the necessary documents to take over paying for Herman's services, including an Individual Services Agreement to be appended to the existing master contract. Cheong told him she had contacted CHO, but was told that CHO could not receive payment from the District while the insurer was being billed. Wax and Cheong repeatedly asked Parents, orally and in writing, to authorize the hospital to cease billing the insurer and begin billing the District, but they did not do so.

---

[9] The parties dispute whether Parents could have continued to pay Kowar if they chose to do so. That dispute need not be resolved here; Parents had and still have rejected at least one adequate alternative.

70.     Cheong confirmed that she asked Parents many times, orally and in writing, to change their billing instructions to CHO, but Parents would not, although they continued to insist that the District pay CHO. Cheong spoke with Mary Kay Therres, CHO's head of accounting, to determine how much the District owed. Therres responded by saying that Parents had directed the hospital in a signed agreement to list the insurer as the payor, and had specifically stated that the District was not to pay. Cheong then attempted to secure an arrangement allowing the District to reimburse the insurer for its previous payments, but could not. Marva Furmidge, CHO's Vice President for Risk and Legal Affairs, then wrote Cheong and District counsel, stating:

> [Parents] have requested that [CHO] bill their health insurance, and the health insurance has paid our bills. Although [CHO] has a signed master contract with [the District] and an individual contract for [Student], [CHO] cannot bill [the District] without the parents' permission. [Parents] have specifically requested that [CHO] continue to bill their private health insurance.

Furmidge also stated that CHO would be unable to "retroactively bill" the District for previous therapy since it had already been paid, and was "not in the position to return the monies to the private insurance company." CHO, she wrote, needed Parents' permission to bill the District for subsequent S/L therapy for Student.

71.     In her testimony, Mother denied that the District asked Parents to instruct CHO to cease billing the insurer and begin billing the District. Her denial was not credible in light of the testimony of Herman, Wax, and Cheong, and the documentary evidence described above.

72.     Mother testified that she never instructed CHO to stop billing the insurer for Herman's services because the CHO S/L services paid for by the insurer were entirely separate from the S/L services the District was obliged to provide under the June 7, 2004 IEP, which were also to be provided by Herman. Mother described the former services as "medical" and the latter as "educational," and stated that she anticipated Student would receive the two kinds of service simultaneously. How Herman could have delivered both kinds of services was not addressed.

73.     Mother's explanation for refusing to allow the District to pay for Student's S/L services at CHO was not credible. Parents never informed the District that they saw a distinction between medical and educational services. They made no attempt to clear up the District's confusion in order to achieve their asserted goal of having two kinds of S/L service simultaneously delivered to Student. The first the District heard of this distinction, or this plan, was at hearing. If Parents had actually sought such a goal, they would have worked with the District to achieve it.

74.     Moreover, although the hospital was billing a health insurer, Herman's S/L services to Student were always educational in nature, not medical. Herman's credentials are educational, not medical. The services Herman described in her written report were educational. Herman appeared at the June 7, 2004 IEP meeting and signed the attendance sheet as "speech pathologist," an educational role, and drafted proposed S/L goals and objectives for the IEP. Student eventually lost Herman's services because CHO changed its speech and language clinic

to a "medical therapy model" (see below). Student produced no proof that he required, was prescribed, or ever received "medical" S/L services.

75.     Throughout SY 2004-2005, the District's inability to pay for Herman's S/L services was the result of Parents' continued insistence that their insurer be billed for those services, not the result of any act or omission of the District. Had parents removed that obstacle, the District would have paid for Herman's services at CHO, and those services would have complied with the S/L requirements of Student's June 7, 2004 IEP. The District did not fail in SY 2004-2005 to deliver S/L services in compliance with Student's IEP; Parents obstructed it from doing so.

### FAPE in SY 2005-2006

*The delivery of services*

76.     Student contends that, during SY 2005-2006, the District continued to fail to provide him behavioral, OT, and S/L services in conformity with his June 7, 2004 IEP and its January 5, 2005 Addendum.

*Behavioral Services in SY 2005-2006*

*CLASS*

77.     Student received ABA services from CLASS from August 29, 2005 (the beginning of SY 2005-2006) through January 27, 2006, but no ABA services for the rest of the school year. Each party argues the other is responsible for that loss.

78.     During fall 2005, Mother became dissatisfied with the services of CLASS. She employed Vicki Wells, a behaviorist (see below), to observe CLASS's interactions with Student and make suggestions for change. She searched for a different ABA provider, communicating extensively with Kevin Dotts, the director of the provider I Can, Too, and invited him to the triennial IEP meeting on January 5, 2006. However, Mother never communicated her displeasure with CLASS either to CLASS or to the District before the triennial meeting.[10]

---

[10]  At hearing, Mother and Wells criticized CLASS's services on four grounds:  1) that one staff member, Melinda Lanning, was inadequately trained; 2) that the agency lacked a "behavior plan"; 3) that it ignored Student's behavioral problems; and 4) that it relied too much on discrete trial training and not enough on language instruction. These arguments, if true, might support part of a claim that Student was denied FAPE because of substandard service and a lack of qualified personnel.  However, no such claim was made in either of Student's complaints, which alleged only that services were not delivered in conformity with Student's IEP, which required behavioral services of stated frequency and duration.  A new claim that FAPE was denied for reasons not set forth in the complaints cannot be decided here. (See Legal Conclusion 34.)  Nor would the evidence support such a claim: it showed that CLASS, an NPA, trained Lanning, a new employee, according to its normal standards, and that Lanning handled Student's behavior according to her training.  Lanning did not like her new job and resigned in two months, but that does not mean her services were inadequate.  It is not clear what Mother and Wells meant by a "behavior plan" or what difference one would have made; Student made no attempt to prove that his behavior was so troublesome that a behavior intervention plan was required by law. (See Legal Conclusion 33.)  Wells testified that a CLASS supervisor told her it was the agency's "protocol" to "ignore" undesirable and self-injurious behaviors.  This claim seemed exaggerated: it is implausible that an agency providing behavioral services would, as a matter of

79.    Mother sought and obtained permission from Denise Pollard, the executive director of CLASS, and her employees, to videotape CLASS employees while videotaping her son at school and home. Her stated purpose was to make a video for the Autism Education Network (AEN). She requested that a videotape machine be available at the January 5, 2006 triennial IEP meeting.

80.    At the January 5, 2006 triennial IEP meeting, which Pollard attended, Mother played a part of the videotape showing her son interacting with CLASS employees, and used it to criticize CLASS's services. Pollard was surprised and angered by the use of the videotape, made under what she saw as false pretenses, and by the sudden criticism of her agency without prior warning or complaint. Harsh words were exchanged, and Pollard left the meeting. Over the next several days, Pollard informed the District of many accumulated grievances it had with Mother: that she frequently cancelled sessions with little or no notice (affecting employees' pay); left CLASS employees idle outside her house while she and Student were hours late for therapy appointments; and restricted access to the binder they shared in which treatment and behavior information was recorded. In a voicemail to Linda Baker, a District program specialist, Pollard stated that Mother had cancelled another session that day; that none of her staff wanted to continue to work with Mother; that one had quit as the result of cancelled sessions; and others were threatening to quit if not removed from the case.[11] Pollard requested that the District find a way to remove CLASS from Student's case.

81.    On January 12, 2006, CLASS announced it would no longer serve Student. The District responded that, under its contract, CLASS was required to give 20 days' notice of cessation of services. CLASS then agreed to serve Student through February 7, but on January 27 the agency ceased its services, stating that Mother had made continued work impossible. Nothing in the record suggests that Student has received any District-funded ABA services since that day.

*Stepping Stones*

82.    When CLASS refused to continue serving Student, the District searched for another ABA provider. When the triennial IEP meeting resumed on February 14, 2006, the District offered the services of Stepping Stones Center for Autistic Spectrum Disorders (Stepping Stones), an NPA. Mother stated she would call the agency to discuss its services. By March 3, the District had signed a contract with Stepping Stones, and the agency had begun an Assessment

---

policy, simply ignore undesirable behavior. It was more likely a difference of opinion about the best way to handle such behavior. In any event, Lanning's testimony about an incident in which Student struck himself on the head more than 30 times showed that she took several steps, unsuccessfully, to control that behavior. Contemporaneous documents confirmed those efforts. CLASS was not ignoring undesirable behaviors. The criticisms made by Mother and Wells were essentially disagreements about methodology, which is left to a district's discretion as long as the district provides or offers a FAPE. (See Legal Conclusions 19-20.) The fact that Mother did not raise these complaints with CLASS or the District for several weeks suggests that she did not perceive them as urgent at the time.

[11]  At hearing, Mother accused CLASS and the District of "conspiring" to make it look as if CLASS's resignation were her fault. However, she produced no evidence to contradict CLASS's charges, other than to say generally that if she cancelled therapy sessions, Student must have been sick on those days.

of Basic Language and Learning Skills (ABLLS) of Student, which it routinely required for services to a new client. By March 20, the ABLLS had been completed.

83.    Stepping Stones never provided direct therapy to Student because Parents rejected its services. Vivian Davis-Nichols, the agency's clinical director, testified that Mother brought Student to her office to discuss services, and that a host of problems of communication and viewpoint arose in the following weeks. For example, Mother used a "meet and greet" session with the therapists assigned to Student to distribute a questionnaire probing their experience, and decided they were insufficiently experienced with autistic children. When the agency sent Mother its parent handbook, which described its policies and procedures, Mother sent back a lengthy set of questions and comments setting conditions and seeking alterations. She proposed, for example, that Parents be able to suspend any therapist who was "not working out," and announced that Student would be videotaped at all times. Davis-Nichols testified that, like other ABA agencies, Stepping Stones did not negotiate its policies and procedures with parents when districts were paying for its services. Mother was so informed, and on April 3, 2006, she wrote to the agency announcing her "decision" that "your agency will not be a good match for [Student's] needs."

84.    Mother's opinion that the therapists assigned by Stepping Stones to Student's case were insufficiently qualified was not supported by other evidence. The therapists were qualified in the views of the State, the District, and the agency. Robert Willis, Stepping Stones' regional manager, described the training required by the agency to employ a therapist as a junior or senior therapist. A junior therapist, he testified, would be enrolled in college. He would not necessarily have experience with autistic children, but would almost always have experience handling children in general. Each junior therapist was trained for each new child by a senior therapist, using such methods as videotape, simulated problems and role-play, and testing. A junior therapist would then observe the senior therapist at work before he began to serve the client under the close supervision of the senior therapist. A senior therapist was required to have, or be close to, a Bachelor's degree, and have a minimum of six months (and usually a year) of experience. Both junior and senior therapists are actively overseen by a case supervisor, who determines goals for the student. A case supervisor must have a master's degree in behavioral analysis or a related field, and must pass the agency's test for competence in ABA. Willis testified without contradiction that all three therapists assigned to Student were well trained for the task. One of them met the agency's qualifications for a junior therapist, and the other two met its qualifications for a senior therapist. They had experience with autistic children. The weight of evidence showed that Stepping Stones's assigned therapists were qualified to serve Student.

85.    Student argues that Stepping Stones was not ready, on February 14, 2006, to begin services to Student, because the therapists the agency selected had all been hired since that date, and therefore could not have delivered therapy right away. Even if true, the argument would not justify outright rejection of the agency seven weeks later. More importantly, Student's argument rests upon the erroneous assumption that services do not begin until individual therapy begins. Student's view implies that a district and an agency unduly delay services if they take time to become familiar with a student's needs before therapy starts. On the contrary, as Davis-Nichols of Stepping Stones and occupational therapist Rita Montez both testified, the process of

initial assessment, evaluation, or familiarization that agencies routinely employ with new clients is an integral part of services, not a prelude to them. To begin therapy without first determining the child's unique needs would contradict the mandate of IDEA that a child's unique needs be determined and addressed. (See Legal Conclusion 1.)  The evidence showed that Stepping Stones began appropriate service to Student as soon as possible by assessing him and becoming familiar with his needs, and that its therapists were ready to serve Student as soon as possible once his needs had been assessed. It also showed that it was Parents' rejection of the agency, not any staffing shortage or delay by Stepping Stones, that prevented the delivery of services.

86.    Cheong testified without contradiction that by April 2006, when the Parents rejected the services of Stepping Stones, the District had attempted to use for Student every available ABA provider in California that met its standards. As a result, the District adhered to its offer of ABA services by Stepping Stones; Parents adhered to their rejection of the agency; and Student went without District-funded ABA services for the rest of the school year.

87.    Between CLASS's resignation and Mother's rejection of Stepping Stones, no significant part of the delay in providing behavioral services was due to any failure of the District. Nonetheless, the District offered to give Student nine weeks of extra behavioral services, in addition to its IEP offer, to compensate for that gap in service. Parents did not accept.

88.    The interruption of Student's ABA services from January 28, 2006, to the end of SY 2005-2006, was due solely to the actions of Parents, not any act or omission of the District. The District did not fail during that period to deliver ABA services in compliance with Student's IEP; Parents obstructed it from doing so.

*Occupational Therapy in SY 2005-2006*

89.    The impasse between Parents and the District concerning the services of Mary Kowar & Associates continued unresolved throughout SY 2005-2006. Student was not provided any OT services by the District because Parents refused to pay Kowar and seek reimbursement, continued to insist that the District contract with Kowar only, and declined available alternatives. The failure to provide OT services during that period was solely due to Parents' conduct, not any act or omission of the District.

*Speech and Language Services in SY 2005-2006*

90.    In late July 2005, CHO announced it was changing its Speech and Language Center to a medical therapy model and would no longer deliver to clients the S/L services it had been delivering in the past. S/L pathologist Herman notified Parents that her services would cease on August 19, 2005. Parents proposed that Herman be replaced by Melissa Jakubowitz of Jakubowitz Associates, an NPA. Jakubowitz was well qualified: she had 27 years' experience in delivering S/L services, including to autistic children. The District agreed to the substitution and contracted with Jakubowitz, who began delivering S/L services to Student on September 15 in conformity with his June 7, 2004 IEP and its January 5, 2005 Addendum. Parents do not claim



that Student suffered any interruption in S/L services between August 19 and September 15.
They may have employed Jakubowitz privately earlier than September 15.

91.    In winter 2006, Mother became concerned that Student was not making
acceptable progress in speech and language. On March 13, 2006, Mother unilaterally terminated
Jakubowitz's services without informing the District. Jakubowitz notified Theresa Anderberg,
then the District's Acting Director of Special Education. Anderberg requested that Jakubowitz
hold open Student's time slot, and agreed to pay her for the time. Anderberg then wrote and
spoke to Mother, notifying her that the service was still available and expressing the District's
concern that it was not being utilized. Mother did not respond. Jakubowitz held open Student's
time slot until mid-April, but never heard from Parents again.

92.    Student received no District-funded S/L services from March 13, 2006, until the
end of SY 2005-2006. This loss was due solely to the actions of Parents, not any act or omission
of the District. The District did not fail during that period to deliver S/L services in compliance
with Student's IEP; Parents obstructed it from doing so by terminating the services of the
District's provider.

*Alleged procedural errors*

*Failing to hold an IEP meeting until January 5, 2006*

93.    Student contends that the District significantly impeded Parents' right to
participate in the decision-making process by failing to hold an IEP meeting concerning
Student's program for SY 2005-2006 until January 5, 2006.

94.    Student's agreed-upon IEP Addendum of January 5, 2005, governed his program
for one year, and set January 5, 2006, as the date for his triennial review. The District began in
spring 2005 to obtain from Parents a date on which triennial assessments could be planned, but
Parents did not respond to calls and letters for several weeks. Then the parties exchanged many
possible dates, but could not agree on one until August 29. There was no evidence that the
District delayed setting a date for the meeting; the calendars of the many participants could not
be coordinated until that date.

95.    After the assessments were planned on August 29, 2005, and completed in
October or early November, the parties attempted to arrange a triennial meeting before January.
Once more they exchanged numerous dates, but could not find one acceptable to all the
participants. Finally, the District fixed the date as January 5, 2006, the date on which the
triennial IEP meeting had been set by the IEP a year earlier. Student offered no evidence that the
District delayed setting the date.

96.    Student produced no evidence that the timing of the triennial IEP meeting had any
effect on Parents' participation in the decision-making process, or on Student's education.
Student was at all times during the school year in the placement (the Son-Light Preschool) that
Parents preferred. The District's offer at the triennial meeting, if accepted, would have kept him
in that placement until the end of SY 2005-2006. Any delay in holding that meeting was

23

unavoidable. It did not significantly impede Parents' opportunity to participate in the decision-making process, or affect Student's education.

*Failing to provide assessment reports to Parents before the triennial IEP meeting*

97.     Student contends that the District significantly impeded Parents' right to participate in the decision-making process by failing to give them copies of the triennial assessment reports before the triennial IEP meeting on January 6, 2006.

98.     Following its standard practice, the District gave all the assessment reports to Parents at the IEP meeting. No law required it to do so earlier. (See Legal Conclusion 28.) At the triennial IEP meeting, Parents understood enough about the contents of the assessments to disagree vehemently with all of them and demand an IEE. At their request, the meeting was recessed until January 19, 2006, then to February 14, then to March 30. Parents had ample time between those meetings to study and understand the assessments.

99.     The evidence suggests that Parents would not have done anything with the assessments if they had received them in advance. School psychologist Ilona Novak testified that she sent an advance copy of her psychoeducational assessment to Mother in early October 2005, suggesting that the two meet if Mother had any questions. When Mother did not respond, Novak called her. Mother stated she had not yet read the assessment. Novak again invited questions but received none before the triennial meeting.

100.     The fact that the District did not give its assessments (except for the psychoeducational assessment) to Parents in advance of the triennial IEP meeting had no consequence. It did not significantly impede Parents' opportunity to participate in the decision-making process, or affect Student's education.

*Failing to provide timely notice of CLASS's termination of its services*

101.     Student contends that the District significantly impeded Parents' right to participate in the decision-making process by failing to give them timely notice of CLASS's withdrawal from the delivery of behavioral services. The agency's first termination letter was dated January 12, 2006. After being reminded that it was required to give 20 days' notice, CLASS sent another letter on January 18. Parents were given the second letter at an IEP meeting on January 19. The District's delay in delivering the news was either seven days or one day. In either case, the District's notice to parents of CLASS's withdrawal was prompt and timely.

102.     Student identifies nothing Parents could or would have done if they had learned earlier of CLASS's withdrawal. The relationship between them and CLASS was damaged beyond repair. By the end of the triennial meeting on January 5, 2006, Parents knew of the agency's complaints, but were doing nothing to respond to them. The brief lapse of time between CLASS's announcement of its withdrawal and the District's notification of Parents was of no consequence and did not significantly impede Parents' opportunity to participate in the decision-making process, or affect Student's education.

*Failing to make an offer of placement to Student at the January 19 and February 14, 2006 IEP meetings*

103.    Student's contention that the District did not make an offer of placement to him at the January 19 and February 14, 2006 meetings is incorrect. At the first meeting, on January 5, the District made a detailed written offer. On page five of the IEP, the District set forth an offer for SY 2005-2006 that essentially left Student in his then-current placement. It described his program and each of his separate services, their frequency and duration, their starting and ending dates, and their location. On page six of the IEP, in identical format, the District offered a program for the Extended School Year (ESY) 2006.[12] And on page seven of the IEP, in identical format, the District offered a program for SY 2006-2007. Each of these parts of the offer was complete and sufficient. (See Legal Conclusion 25.)

104.    The four meetings in 2006, on January 5, January 19, February 14, and March 30, were not separate IEP meetings. They were separate sessions of the same triennial meeting, as their documentation confirms. The latter three occurred because, in each case, Parents requested that the rest of the meeting be postponed. Even if the meetings had been separate, the District was under no obligation to make another offer after January 5. The previous offer was still outstanding, and Parents had not responded to it. If the District did not repeat its January 5 offer on January 19 or February 14, that omission had no consequence, and did not significantly impede Parents' opportunity to participate in the decision-making process, or affect Student's education.

*Failing to have a representative of the proposed behavioral services provider Stepping Stones present at the February 14, 2006 IEP meeting*

105.    Student contends that the District significantly impeded Parents' right to participate in the decision-making process by failing to have a Stepping Stones representative present at the February 14, 2006 IEP meeting, when that agency's services were first proposed. Student does not identify any consequence of this failure, and the record shows none. From February 14 to April 3, Parents considered the services of Stepping Stones and communicated with the agency about their services many times and in detail. The absence of an agency representative at the February 14 meeting had no consequence, and did not significantly impede Parents' opportunity to participate in the decision-making process, or affect Student's education.

*Offering at the March 20, 2006 IEP meeting to place Student at Haight Elementary School, but not allowing Parents to observe this placement until June 8, 2006, when no children were present*

106.    Student contends that the District significantly impeded Parents' right to participate in the decision-making process by offering at the March 20, 2006 IEP meeting to place Student in the SDC at Haight Elementary School, but not allowing Parents to observe this placement until June 8, 2006, when no children were present. However, the offer of placement in Haight Elementary School was made at the January 5, 2006 IEP meeting, but Parents declined

---

[12] In each school year addressed here, Student attended the ESY. References to a school year herein include the ESY following the regular school year unless otherwise noted.

to consider it until they received an IEE. It was not until March 30 that Mother requested an opportunity to visit the SDC.

107.    The evidence showed that Mother had multiple opportunities to visit the Haight SDC before SY 2005-2006 was over. Mother testified her visit did not occur until June eighth. However, her behavioral expert Vicki Wells accompanied her on at least one of her two visits, and sent Mother a bill for visiting the class in May. Mother and Wells both testified that they observed students in the SDC on those occasions. There was no evidence that Mother asked for an earlier visit, or that the District delayed her visit in any way. There was no urgency; the District's offer would not have placed Student in the SDC until the end of August, and Parents had been refusing to respond to the District's January 5, 2006 offer for months. The timing of Mother's visit to the SDC had no consequence, and did not significantly impede Parents' opportunity to participate in the decision-making process, or affect Student's education. Student's contention that the District delayed the visit until students were gone is frivolous.

*The delivery of services in SY 2006-2007*

*Behavioral services in SY 2006-2007*

108.    As SY 2006-2007 began, Parents kept Student in the Son-Light Preschool and continued to ignore the District's placement offer of January 5, 2006. The District adhered to its offer of ABA services by Stepping Stones, and Parents adhered to their rejection of the agency. Nothing in the record suggests that Student received any District-funded ABA services in SY 2006-2007.

109.    On December 15, 2006, Parents moved for a stay put order, arguing that the stay put placement included Student's enrollment in Son-Light. The District welcomed the motion because it saw a stay put order as an opportunity to revive the delivery of services to Student. It opposed the motion only insofar as it would have required Student to remain in Son-Light, arguing that since promotion from grade to grade is assumed in stay put disputes, the proper stay put placement was in kindergarten in the District's Haight Elementary SDC. On January 16, 2007, Judge Peter Paul Castillo of OAH agreed with the District that the proper stay put placement was in the Haight SDC, granted the motion with that modification, and ordered that all IEP services and supports be kept available pending resolution of these disputes.

110.    After the stay put order issued, the District's new Director of Special Education, Rosalind Davenport, checked the availability of service providers so that she could make a new offer to Parents. Since she lacked consent to share information, she did not name Student and spoke only in generalities. On January 19, 2007, she wrote to Parents offering ABA, OT, and S/L services. [13] She renewed the offer of services from the ABA provider Stepping Stones, and enclosed a consent form for the release of information to Stepping Stones "so that the District

---

[13]  The District's opposition to the stay put motion also offered services through these providers.

may speak with this agency regarding [Student's] behavioral services."[14]  Parents did not sign the consent form or return it to the District, or respond in any other way.  Davenport telephoned and then wrote Parents again on January 29 and March 2, renewing her request that Parents sign the consent form for Stepping Stones and two other providers (see below).  Again Parents did not respond.

111.    Student failed to receive behavioral services from January 19, 2007, to the present because Parents would neither agree to the outstanding IEP offer, nor permit the District to release information to Stepping Stones.  The failure was not caused by any act or omission of the District.

*Occupational Therapy Services in SY 2006-2007*

112.    The impasse between Parents and the District concerning the services of Mary Kowar & Associates continued unresolved throughout SY 2006-2007.  Student was not provided any OT services because Parents refused to continue to pay Kowar and seek reimbursement, continued to insist that the District contract with Kowar only, and declined available alternatives.

113.    In her January 19, 2007 letter, Davenport offered Student the services of occupational therapist Dory Maxon.  She enclosed a consent form for the release of information to Maxon.  Parents did not respond.

114.    Sometime in late January or early February, Mother telephoned Maxon, apparently leaving the names of Student and the District, and received a voicemail from Maxon stating that she had not spoken to the District and had never heard of Student.  Mother concluded from the voicemail that Maxon was not ready to begin therapy on the day her services were offered, a conclusion that was irrelevant if true (see above).[15]  Parents did not return the consent form or take any other action to obtain OT services for Student.

115.    Student failed to receive OT services from January 19, 2007, to the present because Parents would neither agree to the outstanding IEP offer, nor permit the District to release information to Maxon.  The failure to deliver OT services was not caused by any act or omission of the District.

*Speech and Language Services in SY 2006-2007*

116.    In her January 19, 2007 letter, Davenport offered Student the services of Progressus Speech Services (Progressus).  She enclosed a consent form for the release of information to Progressus.  Parents did not respond.

---

[14]  The consent form Parents had signed for Stepping Stones in February 2006 provided that "This release is only for the current referral and may not be extended."  It would not have authorized the release of information created months after it was signed.

[15]  Davenport's direct testimony that she contacted all three proposed providers is entitled to more weight than Mother's description of Maxon's voicemail, which was not introduced in evidence.  Maxon did not testify.

117.   Mother testified that she did not respond to Davenport's request because she was unable to reach Progressus to discuss the nature of its services; it did not return her call. The record does not show what message Mother left with Progressus, or why Progressus did not respond. It is not clear how Progressus could have engaged in a discussion of services for Student without knowing something about him. Davenport testified that, to comply with confidentiality laws, the District would release no information to the agency without consent, not even Student's name. Mother would not give consent until she could approve of the agency.

118.   Student failed to receive S/L services from January 19, 2007, to the present because Parents would neither agree to the outstanding IEP offer, nor permit the District to release information to Progressus. The failure was not caused by any act or omission of the District.

*Alleged procedural error in SY 2006-2007:  Refusing to convene an IEP meeting from June 20, 2006, to the present*

119.   Student contends that the District significantly impeded Parents' right to participate in the decision-making process by failing to convene an IEP meeting from June 20, 2006, to the present, even though Mother repeatedly requested such a meeting. On June 30 and July 20, Mother made written requests that the District convene another IEP meeting "to continue the discussion of our son's educational needs." The District did not respond. It had already convened its annual IEP meeting in four separate sessions in 2006. It had no information that Student was failing to progress, that Parents wanted to develop or revise the IEP, or that there existed any new assessment to discuss. The District correctly concluded from Mother's request that her purpose was simply to continue stating her disagreement with the District's offer. The District also correctly concluded that the parties had reached an impasse that only a due process hearing could resolve. In these circumstances, the District was under no obligation to convene another IEP meeting (see Legal Conclusion 30), and its failure to do so did not significantly impede Parents' opportunity to participate in the decision-making process, or affect Student's education.

*The District's offer of FAPE for SY 2006-2007*

*The Haight Elementary SDC for autistic children*

120.   In Case No. 2006100365, the District seeks an order declaring that its placement offer of January 5, 2006, would have provided Student a FAPE in SY 2006-2007 had Parents accepted it.[16]   That offer was of placement in the SDC for autistic children at Haight Elementary School. It included four hours a day, five days a week, in the SDC itself; mainstreaming in a general education classroom one hour a day, five days a week; a one-to-one aide at school; 30 minutes of OT twice a week; one hour each of S/L and OT consultation a month, and transportation from home to school and back. It also included numerous services integrated into the SDC's program (see below).

---

[16]  In its request, the District sought the same relief for SY 2005-2006, but withdrew that request at the prehearing conference.

121.    The Haight SDC is taught by Michelle Toth, who has worked for the District for three years. Before that she worked for six years for the Redwood City School District as an inclusion specialist. For four years before her work in Redwood City, she was the teacher of an SDC for children with moderate to severe disabilities in the San Francisco Unified School District. In 1992 she received a teaching credential for general education elementary school students, and in 1997 a special education credential for students with moderate to severe disabilities ranging in age from pre-kindergarten to adult.

122.    Toth testified that she has 10 students this year, and is assisted by four paraprofessionals trained in autism, a speech therapist, an occupational therapist, a behavioral specialist, and an adaptive physical education teacher. In training the staff, Toth and the behaviorist emphasize using functional analyses for problem behaviors; preventative strategies to promote appropriate behavior; instructional strategies emphasizing the use of language in place of problem behaviors; and reactive strategies, such as three-step prompting, for non-compliance with adult instructions. She and her staff write positive behavior support plans for specific students who require more intensive behavioral intervention. Staff is trained in the procedures required for each plan, and in data collection techniques for each plan. The class's behavioral strategies include discrete trial training, a technique designed for autistic children in which skills are broken down into component parts that are taught systematically, using repeated presentations. Incidental teaching strategies are also used to take advantage of learning opportunities in naturally occurring situations such as recess, snack time, art, mainstream classrooms, and free play. This helps students generalize skills.

123.    The SDC is highly structured. Because many autistic students experience anxiety as a result of change in routine and transitions, the class follows set routines. The curriculum is language-enriched; that is, language-based and infused with language training. It emphasizes communications skills throughout the day. The speech therapist is present four days a week. She works directly with students two days a week individually and at circle time, and at other times collaborates with Toth on each student's individual program, attends staff meetings, and helps train staff in using S/L strategies in the classroom. Toth and her aides integrate language and communication throughout the day in dealing with a student individually, in group activities, and in facilitated play.

124.    The routine and structure of the SDC are based on the TEACCH (Treatment and Education of Autistic and Communication Handicapped Children) model, which uses visual schedules and routines to help students become more independent. Physical areas of the classroom are set aside for specific functions such as work, art, and reading. TEACCH requires the development of work systems incorporating visual cues, encouraging left to right scanning, and utilizing routine. Novel tasks and materials are taught first one-to-one, and then tried independently. Least-to-most prompting, a gradation of encouragements, is used during independent tasks to prevent prompt dependency. Most teaching is one-to-one.

125.    Some of Toth's students are verbal; some are not. Those who are not communicate using PECS (the Picture Exchange Communications System). The TEACCH method is adapted to individual needs. Each student has a schedule with pictures; those who can read also have icons. When shown a card with his name on it, a student checks his schedule and

29

locates the appropriate picture or icon. He then matches it with the icon identifying an area of the room, so he knows to go to a particular place. How much language is used depends on the student; some are required to name the place in response to the question "Where do you go next?"

126.    Mainstreaming, which is different from full inclusion,[17] is used for students in Toth's SDC. Student, for example, would be mainstreamed in a general education classroom one hour a day, with appropriate help from his one-to-one aide, and at lunch, recess, and assemblies. This practice provides students with typical peer models for behavior and language, and encourages participation in the larger school community.

127.    In the SDC, social skills are addressed in facilitated play, in structured activities like greetings and interactions, and on the playground with typically developing peers.

128.    Toth attended the January 5, 2006 IEP meeting for Student and heard the assessment reports presented there. She testified that Student seemed like "a good fit" for her classroom; his level of need matched the level of service in the SDC. At hearing, she reviewed Student's proposed goals and objectives, and stated that all of them could be implemented by her and her staff in her classroom. Not every goal would have to be pursued in the SDC; some could be fulfilled in the regular education classroom.

129.    School psychologist Ilana Novak confirmed Toth's testimony. Based on her assessment, Novak thought that Student should be in a highly structured environment with educators who specialize in autism. He would also benefit from mainstreaming. Novak visited Toth's SDC and talked to Toth. She saw the class as highly structured, with a high ratio of adults to children, individualized programs, circle time, free time, mainstreaming, a substantial language component, and a teacher trained to work with autistic students. In her view, the SDC program fit her recommendations.

130.    Occupational therapist Judith Auston noted that, even beyond the specific offer to Student of 30 minutes of OT twice a week and one hour of OT consultation a month, Student would receive a substantial amount of OT in the routine of the SDC. Auston designs a gross motor program and fine motor program for each child in the SDC to do daily. The fine motor program is done during seat work activity and fine motor small group; the gross motor program is supervised by the OT, the teacher, and the aides. Gross motor activity is blended with a social skills program by creating activities between students such as taking turns rolling a ball to each other. Auston participates in staff meetings throughout the year, and trains aides in attempting to make every fine motor activity a therapeutic one. OT, she explained, is embedded in the curriculum of the SDC.

131.    Valerie Coleman, the S/L therapist who conducted the triennial speech and language assessment of Student, did not testify. However, she was assisted in drafting her report by S/L therapist Lois Sonneman, who reviewed a draft of the report. Sonneman is familiar with

---

[17] Mainstreaming is the part-time situating of an SDC student in a general education classroom. Full inclusion is for students based in a general education class all day, for whom the general education teacher is responsible.

the Haight SDC. She thought that the District's offer of one hour of S/L consultation a month in the SDC was appropriate. In her opinion, S/L services are delivered there as part of the classroom's regular program, not just independently, in order to promote the generalization of skills into regular settings. She praised the SDC program as language-enriched, and the S/L therapist there for the time she spent working with the teacher.

*Student's criticisms of the SDC*

132.    The sole expert witness who testified in support of Student's claim that the District's offer was inappropriate was Vicki Wells. (Mother's testimony supported Wells's views, but added little to them.) Wells has an associate's degree from the University of California at Santa Barbara in early childhood development, a bachelor's degree from California State University at Sacramento in child development, and a master's degree from California State University at San Francisco in special education with an emphasis in autism and ABA. She has worked in the field of autism for 15 years, including in Lovaas replication studies in collaboration with the Sacramento Regional Center. She has held master contracts with school districts, been employed by SELPAs (Special Education Local Planning Areas), and has received intensive training in ABA while working as an in-class ABA support provider. She currently operates Autism Collaborative Therapies in Oakland. Before 2000, she ran an agency, Synergistic Interventions, that had its NPA status revoked by the State for reasons not in the record. She is not licensed to perform assessments in any particular discipline.

133.    Wells testified that the Haight SDC would be an inappropriate placement for Student for two reasons: that the TEACCH program was wrong for him, and that he needed to be in a full inclusion setting (the least restrictive environment).

134.    Even taken uncritically, Wells's testimony did not support her conclusion that the Haight placement would be inappropriate for Student, because she only addressed whether it would be better or worse than his current situation in Son-Light Preschool. The basis for her opinion was that the Haight placement would be "a step backward" from Student's current situation at Son-Light. However, whether Son-Light is a better placement than the Haight SDC is irrelevant here, because a district is not required by IDEA to maximize a student's learning opportunities or to provide the best possible placement. (See Legal Conclusion 3.) Wells did not testify that the Haight placement lacked any of the essentials of a FAPE: She did not address whether the Haight placement would meet all of Student's unique needs, or was reasonably calculated to afford him educational benefit. (See Legal Conclusions 1-3.)

135.    Much of Wells's testimony did not reflect adversely on the Haight SDC. She testified, for example, that the staffing was adequate. She did not contradict the testimony of Toth and others that Student would be involved in activities with other children in a language-rich environment.

136.    Wells praised the Son-Light environment as exposing Student to "typical peers," whereas the SDC would not. However, Student's classmates at Son-Light are not his typical peers. He is older than all of them, and twice the age of some. The other 19 students range in

31

age from two to five. Student will be eight in September 2007, and would have been seven in the month he was enrolled in the Haight SDC had Parents accepted the District's offer.

137.    Wells praised the Son-Light environment as being a typical program utilizing incidental learning, whereas the SDC was more structured. She did not explain why a structured environment was not preferable, and at one point agreed that Student would benefit from one. All other expert witnesses testified that Student should have a highly structured environment.

*TEACCH as a methodology*

138.    Wells testified that the TEACCH methodology was wrong for Student in the SDC, and as used by CLASS. Most of her criticism of the use of TEACCH related to its use by CLASS in the preschool and home. From her observations at the preschool, she concluded that TEACCH was not helping to facilitate Student's language development. She testified that she is TEACCH-trained and does not believe that it is an inappropriate method; she just would not have used it as "a primary" teaching method for Student, although she observed, in apparent approval of TEACCH's premise, that children do need to learn to work independently. Wells uses the method, but usually with children older than Student. She would have structured Student's environment in the preschool differently, and focused more on verbal learning, using a lot of verbal scripting.

139.    Wells testified that she visited the SDC on two occasions, but Toth remembered her visiting only once, and Wells's bill to Mother charged for only one visit. Wells did not describe the duration or timing of her visit, and did not testify that she saw the TEACCH methodology being employed. Toth testified that Wells visited once between eight and nine in the morning. The schedule of the SDC, which is closely followed, provides for arrival, bathroom, and facilitated free time between 8:20 a.m. and 8:45 a.m., circle time between 8:45 a.m. and 9:00 a.m., rotation among TEACCH work stations from 9:00 a.m. to 9:20 a.m., and then snack time. According to Toth, Wells departed at some time during the work station rotation and before snack time. Wells's visit to the SDC, then, allowed her 20 minutes or less to observe the use of the TEACCH method by Toth and her staff, who have more experience and training in its use than the junior CLASS employee Wells observed at the preschool. Acting Special Education Director Annenberg, who accompanied Wells, testified without contradiction that, as Wells departed, she said it looked like a good program to her.

140.    Nothing in Wells's testimony supports Student's argument that the Haight SDC placement would have been inappropriate for him. She did not stay in the SDC long enough to observe the language-enriched curriculum Toth and other District witnesses described, and offered no reason why that curriculum would not have addressed her concerns about language instruction. At best, Wells' testimony supported the view that different methods would have been better for Student. (See Legal Conclusions 1-3.) Wells did not testify that the use of the TEACCH methodology in the SDC would have deprived Student of any of the essentials of a FAPE: she did not address whether use of the method would have met all of Student's unique needs, or was reasonably calculated to afford him educational benefit. (See Legal Conclusions 1-3.)

32

*Least Restrictive Environment*

141.    Student argues that the Haight SDC placement would be inappropriate because it is not a full inclusion setting; i.e., it is not the least restrictive environment in which Student could be educated satisfactorily.  That determinaation requires balancing four factors:  the academic benefits to Student of placement in a general education setting; the nonacademic benefits of that placement; the effects of that placement on the teacher and other students; and the cost of that placement.[18]  (See Legal Conclusions 7-8.)

*Academic Benefits*

142.    State standards require that public school kindergarten students be taught certain preacademic skills.  In the area of English language arts, they must, for example, learn to write words and brief sentences that are legible; listen and respond to stories based on well-known characters; identify characters, settings, and important events; use letters and phonetically spelled words to write about experiences, stories, people, objects, or events; write by moving from left to right and from top to bottom; write uppercase and lowercase letters of the alphabet independently, attending to the form and proper spacing of the letters; recognize and use complete, coherent sentences when speaking; recite short poems, rhymes, and songs; and relate an experience or creative story in a logical sequence. (California State Board of Education Content Standards, English Language Arts, adopted Dec. 1997.)  In the area of mathematics, kindergarten students must, for example, learn to count, recognize, represent, name, and order a number of objects (up to 30); know that larger numbers describe sets with more objects in them than smaller numbers have; use concrete objects to determine the answers to addition and subtraction problems (for two numbers that are each less than 10); compare the length, weight, and capacity of objects by making direct comparisons; identify and describe common geometric objects; compare familiar plane and solid objects by common attributes; pose information questions, collect data, and record results using objects, pictures, and picture graphs; and identify, describe, and extend simple patterns (such as circles or triangles) by referring to their shapes, sizes, or colors. (*Id.*, Mathematics, adopted Dec. 1997.)  And in the area of science, students must, for example, know that objects can be described in terms of the materials they are made of (clay, cloth, or paper, for example) and their physical properties; know how to observe and describe similarities and differences in the appearance and behavior of plants and animals; know characteristics of mountains, rivers, oceans, valleys, deserts, and local landforms; describe the properties of common objects; and communicate observations orally and through drawings. (*Id.*, Science, adopted Oct. 1998.)

143.    The evidence showed that Student is, and in the near future will be, unable to acquire or participate in learning these required skills. The District's triennial evaluations of Student showed that his developmental level is approximately half that of his typically developing peers, that he is below the first percentile in cognition relative to them, and that he is functioning in the mentally retarded range.  At present, he cannot independently form a vertical line in any letter of his name, express himself beyond making one or two word utterances, understand the alphabet, understand what numbers correspond to, or make his desires known by

---

[18]  The District does not argue that placing Student in general education would be unduly costly, so the question is not further addressed here.

means other than gestures or tugging on an adult. Psychologist Novak testified that she did not believe Student "can learn much in the academic setting of a regular classroom; he *really needs an individualized program.*" No witness disagreed. Student presented no evidence that he could benefit in any way from the preacademic instruction in a regular education kindergarten. The evidence showed he could not.

### Non-academic benefits

144.    Student's ability to engage in social interaction with other children is minimal, even with his two to five-year-old colleagues in preschool. Resource specialist Abad testified that, during her observation of Student at his preschool, he did not interact with any other students. Even when touched by another student, he did not turn to respond or show any awareness. He could "parallel play," but did not initiate interaction with other students. Other students had to be prompted to play with him. During her observation, a tutor put another student next to Student for play, but Student made no approach to the other student and did not respond to that child's overtures. When given a choice, Student chose to sit by himself in a corner. S/L pathologist Coleman reported from her observations and caregivers' reports that Student did not respond to greetings or requests from strangers, give appropriate eye contact, initiate conversation, or respond to other children's play requests. He could sit in circle time, but would not engage in the activities of the other students there.

145.    Mother testified that Student socializes well with other students in his preschool, but her testimony was outweighed by that of many other observers. Mother produced and introduced in evidence a video presentation of more than an hour in length that showed Student with his fellow students in class, on the playground, and in the community. Special Education Director Davenport accurately characterized the video as showing that Student was heavily dependent upon his aide and did not interact much with other students. Renate Westbrooks, the Director of Son-Light Preschool, who has been Student's teacher since he entered the school at age two, testified that Student's social skills had improved in his five years at the school, and that he had developed "friendship groups" of students who had "buddied with him." However, asked to describe how Student had benefited socially from being exposed to his classmates, she answered that it was a "difficult question," and that she was not sure Student was "able to distinguish that he's learned anything from them socially." She testified that Student can sit at a circle and at a table with his classmates, but she was not sure they taught him that, or whether he just imitates what he sees them doing. Asked for examples of his social skills, she testified that when all students were cooperating on completing an alphabet puzzle on the floor, he could wait his turn and put his letter in the appropriate place. She also testified he could sing along in circle time. In a letter to psychologist Novak, Westbrooks stated that Student is "clearly ready for more social interaction with his pre-school peers" and that he shows an interest in what his classmates are doing, "especially if they are playing with one of his favorite toys." She added, however, that social development "must be initiated by his therapist if this is not naturally occurring in his environment" and that "much work lies ahead for [Student] in order to prepare him for ... Kindergarten."


146.    The only evidence of Student's social skills came from his preschool environment. It supported the inference that Student would have even more difficulty socializing with typically developing peers his own age but twice his developmental level, in a new environment, than he does with younger children in his familiar preschool environment. There was no evidence to the contrary. Student did not attempt to prove that he could benefit from social exposure to his peers in a regular education classroom. The evidence suggested that he could not.

### Effect on the regular education teacher and other students

147.    Student misbehaves in his preschool class, but not to the extent that he is greatly disruptive. Abad and CLASS therapist Lanning reported that in his preschool, Student sometimes hit his head. Wells reported that he wandered from place to place, removed from a felt board the shapes other students had put there to create a picture, and walked through other children's Lego constructions, or dismantled them. Several observers reported he omitted high pitched squeals. However, the video presentation produced by Mother showed -- perhaps selectively -- that Student tolerated the close proximity of others well, and that he was comfortable acting in parallel with them, though not interacting with them. Overall, the evidence showed that Student would likely cause some minor to moderate disruption of a general education classroom, but that it would not be serious or severe.

148.    On balance, the evidence showed that Student would derive little or no academic or nonacademic benefit from inclusion in a regular education classroom, and that he would be mildly or moderately but not greatly disruptive there. The evidence showed, therefore, that Student cannot be educated satisfactorily in a general education classroom (see Legal Conclusions 7-8), and that the District's offer of placement in the Haight SDC was the least restrictive environment in which he could be educated satisfactorily.

149.    In light of the qualifications of the District witnesses Toth, Novak, Auston, and Sonneman, and the plausible details of their consistent descriptions of the Haight SDC, the weight of evidence was that the District's offer would have addressed all of Student's unique needs, and was reasonably calculated to bring him educational benefit.

### Reimbursement

#### The July 13, 2005 request

150.    Parents' claims for reimbursement fall into three categories. First, Parents claim that the District did not completely reimburse them the $21,949.40 they demanded on July 13, 2005, for payments to the OT provider Mary Kowar, the Son-Light Preschool, Student's one-to-one aide, the CHO speech and language clinic, and Dr. Miranda Gabriel, a consultant at Behavior Analysts, Inc. (BAI). On August 15, the District agreed to reimburse Parents (and within a few days did reimburse them) in the amount of $11,749.00. It declined, however, to reimburse them for an additional $10,140.00.

151.    The District withheld $6,445.00 of that amount on the ground that the bills were for services that were either not a part of Student's IEP, or had been paid for by insurance. The District stated that it did not owe for Dr. Gabriel or BAI because those services were not a part of its IEP offer, and that it would not compensate Parents for $2,485 to CHO until it received proper documentation of the expenditure. (The District noted that it believed CHO was being reimbursed by Parents' health insurer (see above).)  Parents made no attempt to prove that the services of Gabriel and BAI were part of Student's outstanding IEP, or that they were entitled to reimbursement of those expenses on any other theory. Nor did they attempt to prove that they had submitted proper documentation of any payment to CHO. Therefore Parents failed to prove that they are entitled to compensation for those items.

152.    The District declined to pay $3,695 on the ground that the items comprising that amount had already been paid. It sent Parents a spreadsheet showing that $3,695 in invoices from Kowar, Son-Light, and the one-to-one aide had already been paid. Anderberg explained the calculations in the spreadsheet in her testimony, and the District introduced it in evidence. Parents, who merely restate these claims here, made no attempt to prove that those invoices had not already been paid, and therefore failed to prove that they are entitled to compensation for those items.

*The July 20, 2006 request*

153.    On July 20, 2006, Parents demanded that the District repay them $12,735 for Son-Light Preschool, Student's one-to-one aide, and services from Autism Collaborative Therapies (Vicki Wells). The District paid Parents for Son-Light and the aide, but declined to pay $3,475 for Autism Collaborative Therapies on the grounds that it was not an NPA, that Mother had procured its services unilaterally and outside the IEP process, and that the District was not obliged to pay for outside services when it had an appropriate outstanding IEP offer. Parents restate the demand for Wells' services here, but made no effort to prove that reimbursement for services from Autism Collaborative Therapies is justified on any ground. Parents therefore did not prove that they are entitled to compensation for that item.[19]

*SY 2006-2007 expenditures*

154.    Parents request compensation for three expenditures during SY 2006-2007: $4,410 for tuition for Son-Light Preschool; $5,950 for Student's one-to-one aide; and $3,880.48 for the IEE by Dr. Allison Lowy Apple. The claims for expenses for preschool tuition and the aide are premised on the argument that the District did not offer Student a FAPE for SY 2006-2007. Since it did, Parents are not entitled to reimbursement for those expenditures. As explained above, Parents are also not entitled to reimbursement for the Lowy Apple assessment.

155.    The special education and related services for which the District reimbursed Parents were provided at public expense.  (See Legal Conclusion 1.)

---

[19] Parents demanded an additional $433 that the District did not pay, but the record does not reflect the nature of the expenditure, the reason the District declined to reimburse for it, or why Parents claim they are entitled to it. Parents have not, therefore, proved entitlement to that sum.

*Compensatory Education*

156.    Student seeks compensatory education for denial of services in the areas of behavioral support, OT, and S/L therapy (see above). However, the sole responsibility for those denials lies with Parents (see above), so Student is not entitled to compensatory education.

*An immediate IEP team meeting*

157.    Since the District did not violate IDEA by declining to call an IEP meeting from June 20, 2006, to the present, Student is not entitled to an immediate IEP team meeting.

CONCLUSIONS OF LAW

*Elements of a FAPE*

1.    Under the IDEA and state law, children with disabilities have the right to free appropriate public education (FAPE). (20 U.S.C. § 1400(d); Ed. Code, § 56000.) FAPE means special education and related services that are available to the child at no charge to the parent or guardian, meet State educational standards, and conform to the child's IEP. (20 U.S.C. § 1401(a)(9).) A "free appropriate public education" is defined as:

> special education and related services that (A) have been provided at public expense, under public supervision and direction, and without charge, (B) meet the standards of the State educational agency, (C) include an appropriate preschool, elementary, or secondary school education in the State involved, and (D) are provided in conformity with [an] individualized education program ... .

(20 U. S. C. § 1401(9).) "Related services" are transportation and other developmental, corrective and supportive services as may be required to assist the child in benefiting from special education. (20 U.S.C. § 1401(26).) In California, related services are called designated instruction and services (DIS), which must be provided if they may be required to assist the child in benefiting from special education. (Ed. Code, § 56363, subd.(a).)

2.    There are two parts to the legal analysis of a school district's compliance with the IDEA. First, the tribunal must determine whether the district has complied with the procedures set forth in the IDEA. (*Board of Educ. v. Rowley* (1982) 458 U.S. 176, 206-07 [73 L.Ed.2d 690].) Second, the tribunal must decide whether the IEP developed through those procedures was reasonably calculated to enable the child to receive educational benefit. (*Ibid.*)

3.    In *Rowley*, the Supreme Court held that the IDEA does not require school districts to provide special education students the best education available, or to provide instruction or services that maximize a student's abilities. (*Rowley, supra,* at 198.) School districts are required to provide only a "basic floor of opportunity" that consists of access to specialized instruction

37

and related services individually designed to provide educational benefit to the student. (*Id.* at p. 201; see also, *M.M. v. School Bd.* (11th Cir. 2006) 437 F.3d 1085, 1102-03.)

4.    In determining whether a district offered a student a FAPE, the proper focus is on the adequacy of the District's placement, not on any alternative proposal. (*Gregory K. v. Longview School Dist.* (9th Cir. 1987) 811 F.2d 1307, 1314.)

5.    An IEP is evaluated in light of information available at the time it was developed; it is not judged in hindsight. (*Adams v. Oregon* (9th Cir. 1999) 195 F.3d 1141, 1149.) "An IEP is a snapshot, not a retrospective." (*Fuhrmann v. East Hanover Bd. of Educ.* (3d Cir. 1993) 993 F.2d 1031, 1041.) It must be evaluated in terms of what was objectively reasonable when the IEP was developed. (*Ibid.*)

6.    When a school district does not perform exactly as called for by an IEP, the district does not violate the IDEA unless it is shown to have "materially failed to implement the child's IEP. A material failure occurs when the services provided to a disabled child fall significantly short of those required by the IEP." (*Van Duyn v. Baker School Dist. 5J* (9th Cir. 2007) 481 F.3d 770, 773.) A brief gap in the delivery of services, for example, may not be a material failure. (*Sarah Z. v. Menlo Park City School Dist.* (N.D.Cal., May 30, 2007, No. C 06-4098 PJH) 2007 U.S.Dist. LEXIS 39025, pp. 22-23.) And a brief delay in the commencement of related services may be justified, depending upon the circumstances giving rise to the delay. (*D.D. v. New York City Bd. of Educ.* (2d Cir. 2006) 465 F.3d 503, 508.)

*Least Restrictive Environment*

7.    Federal and state law also require a school district to provide special education in the least restrictive environment (LRE). A special education student must be educated with nondisabled peers "to the maximum extent appropriate," and may be removed from the regular education environment only when the nature or severity of the student's disabilities is such that education in regular classes with the use of supplementary aids and services "cannot be achieved satisfactorily." (20 U.S.C. § 1412 (a)(5)(A); 34 C.F.R. § 300.550(b); Ed. Code, § 56364.2, subd. (a).) A placement must foster maximum interaction between disabled students and their nondisabled peers "in a manner that is appropriate to the needs of both." (Ed. Code, § 56031.) The Supreme Court has noted, however, that IDEA's use of the word "appropriate" reflects Congressional recognition "that some settings simply are not suitable environments for the participation of some handicapped children." (*Rowley, supra*, 458 U.S. at 197.)

8.    The IDEA establishes a strong preference in favor of the placement of a special education student in the LRE. (20 U.S.C. § 1412 (a)(5)(A); *Rowley, supra*, 458 U.S. at 181 n.4; *Poolaw v. Bishop* (9th Cir. 1995) 67 F.3d 830, 834.) In light of this preference, and in order to measure whether a placement is in the LRE, the Ninth Circuit, in *Sacramento City Unified Sch. Dist. v. Rachel H.* (9th Cir. 1994) 14 F.3d 1398, 1403, has adopted a balancing test that requires the consideration of four factors:

(1) the educational benefits of placement full-time in a regular class; (2) the non-academic benefits of such placement; (3) the effect [the student] had on the teacher and children in the regular class; and (4) the costs of mainstreaming the [student].

*Requirements for Assessments*

9.    Before any action is taken with respect to the initial placement of an individual with exceptional needs, an assessment of the pupil's educational needs shall be conducted. (Ed. Code, § 56320.) Thereafter, special education students must be reassessed annually or more frequently, if conditions warrant, or if the pupil demonstrates a lack of progress, or the parent or teacher requests a meeting to develop, review, or revise the IEP. (Ed. Code, §§ 56343, 56381.) The student must be assessed in all areas related to his suspected disability, and no single procedure may be used as the sole criterion for determining whether the student has a disability or determining an appropriate educational program for the student. (20 U.S.C. § 1414 (b)(2); Ed. Code, § 56320, subd.(e), (f).) Tests and assessment materials must be administered by trained personnel in conformance with the instructions provided by the producer of such tests. (20 U.S.C. § 1414(b)(2), (3); Ed. Code, § 56320, subd. (a), (b).)

10.    Assessments must be conducted by individuals who are both "knowledgeable of [the student's] disability" and "competent to perform the assessment, as determined by the school district, county office, or special education local plan area." (Ed. Code, §§ 56320, subd. (g), 56322; see 20 U.S.C. § 1414(b)(3)(A)(iv).) A psychological assessment must be performed by a credentialed school psychologist. (Ed. Code, § 56324.) Tests and assessment materials must be validated for the specific purpose for which they are used; must be selected and administered so as not to be racially, culturally or sexually discriminatory; and must be provided and administered in the student's primary language or other mode of communication unless this is clearly not feasible. (20 U.S.C. § 1414(a)(2), (3); Ed. Code, § 56320, subd. (a).)

11.    *Determination of Issue No. 1:*  The District's triennial assessments of Student were not inaccurate. Based on Factual Findings 4-17, Student failed to prove that the assessments were inaccurate or in violation of law in any way.

*Independent Educational Assessment (IEE)*

12.    When a parent disagrees with an assessment obtained by the public educational agency, the parent has the right to an independent educational evaluation (IEE) from qualified specialists at public expense, unless the educational agency is able to demonstrate at a due process hearing that its assessment was appropriate.  (Ed. Code, § 56329, subd. (b), (c).)

13.    *Determination of Issue No. 2:*  The District should not have reimbursed Parents for the IEE conducted by Dr. Allison Lowy Apple. Based on Factual Findings 18-30, the IEE was obtained and conducted before, and therefore not because of disagreement with, the District's triennial assessments.

39

14.     *Determination of Issue No. 7:*  The District offered Student a FAPE for SY 2006-2007 by offering to place him in the SDC at Haight Elementary School with related services and supports.  Based on Factual Findings 120-149, the offer addressed all his unique needs, and was reasonably calculated to bring him educational benefit.  The SDC, on balance, was the least restrictive environment in which he could be satisfactorily educated, because he would not have benefited academically or nonacademically in a general education kindergarten class, and his presence there would have been mildly to moderately disruptive to the teacher and other students.

*Related Services*

15.     The IDEA requires that an eligible student receive related services, such as transportation and developmental, corrective, and other supportive services, "as may be required to assist a child with a disability to benefit from special education."  (14 U.S.C. § 1401(a)(26).)  The services must be "sufficient ... to permit the child to benefit educationally from that instruction." (*Rowley, supra,* 458 U.S. at p. 203.)

16.     California law equates related services with "designated instruction and services" (DIS), and, like federal law, requires that an eligible student receive them "as may be required to assist" the student "to benefit from special education."  (Ed. Code, §§ 56031, 60010, subd. (h).)

*Contracting with Service Providers*

17.     Part 30 of Division Four of the Education Code (§ 56000 et seq.), which governs special education, sets forth the conditions under which a school district may contract with an entity outside the district for special education and services.  Pursuant to that Part, a district may make such a contract only if the outside establishment or individual is certified by the California Department of Education under certain standards.

18.     A nonpublic, nonsectarian agency is defined by Education Code section 56035 as:

a private, nonsectarian establishment or individual that provides related services necessary for an individual with exceptional needs to benefit educationally from the pupil's educational program pursuant to an individualized education program and that is certified by the department.

Such an individual or agency may be certified by meeting the detailed requirements, and following the procedures, of Education Code section 56366.1.  When certified, it may enter into a master contract with a school district containing the provisions required by Education Code section 56366, one of which is an undertaking to give 20 days' notice before terminating the contract.  However, if such an establishment or individual is not certified pursuant to section 56366.1, a contract is not authorized.  Section 56366, subdivision (d), provides:

[A] master contract for special education and related services provided by a nonpublic, nonsectarian school or agency may not be authorized under this part, unless the school or agency has been certified as meeting those standards relating

40

to the required special education and specified related services and facilities for individuals with exceptional needs.

Unless the agency has been certified, "no master contract may be negotiated by the local educational agency." (*California Ass'n of Private Special Education Schools v. State Dep't of Educ.* (2006) 141 Cal.App.4th 360, 369.)

*Right to determine methodologies and service providers*

19.    In *Rowley*, the Supreme Court held that courts must refrain from imposing their views of preferable educational methods upon school districts because courts lack the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy. (*Rowley, supra,* 458 U.S. at p. 208.) Accordingly, as long as the requirements of IDEA are satisfied, "questions of methodology are for resolution by the State." (*Ibid.*)

20.    Federal courts of appeal have consistently interpreted *Rowley* to mean that, as long as a district provides or offers a FAPE, the choice of methodology is up to the district, not the parent. (*Gill v. Columbia 93 School Dist.* (8th Cir. 2000) 217 F.3d 1027, 1036-37; *Barnett v. Fairfax County School Bd.* (4th Cir. 1991) 927 F.2d 146, 152; *Lachman v. Illinois State Bd. of Educ.* (7th Cir. 1988) 852 F.2d 290, 296-97; see also, *M.M. v. Sch. Bd., supra,* 437 F.3d at pp.1102-03; *Adams v. Oregon, supra,* 195 F.3d at 1149-50.)

21.    Like the choice of methodology, the choice of service provider is also up to the district, as long as it offers or provides a FAPE. As held in *N.R. v. San Ramon Valley Unified School Dist.* (N.D.Cal., Jan. 25, 2007, No. C 06-1987 MHP) 2007 U.S. Dist. LEXIS 9135:

[Student] is not entitled to his choice of service providers. See *Slama ex rel. Slama v. Indep. Sch. Dist. No. 2580,* 259 F. Supp. 2d 880, 885 (D. Minn. 2003) (holding that the district's refusal to assign the service provider of plaintiff's choice did not constitute a denial of FAPE). The Act requires only that the service provider be able to meet his needs.

The IDEA "does not empower parents to make unilateral decisions about programs the public funds." (*O'Dell v. Special School Dist.* (E.D. Mo., March 30, 2007, No. 4:05 CV 2090 DDN) 47 IDELR 216; see also, *Gellerman v. Calaveras Unified School Dist.* (9th Cir., July 25, 2002, No. 00-17205) (unpublished), 37 IDELR 125 [Parents not entitled to have Student's home-based aide work with him in school where school had assigned qualified paraprofessional].)

*Parental obstruction*

22.    A district does not fail to implement an IEP if, because of parental obstruction, it cannot do so. (See, *Doe v. Defendant I* (6th Cir. 1990) 898 F.2d 1186, 1191; see also, *Cone v. Randolph County Schools Bd. of Educ.* (M.D.N.C., Oct. 20, 2006, No. 1:06CV00579) 46 IDELR 250; *Glendale Unified School Dist. v. Almasi* (C.D.Cal. 2000) 122 F.Supp.2d 1093, 1109-10; *B.G. v. Cranford Bd. of Educ.* (D.N.J. 1988) 702 F.Supp.1158, 1165-66; *Student v. Riverside Unified School Dist.,* OAH Case No. N2005110775 (May 5, 2006)[" It is patently unfair to

determine that the District has failed to offer a FAPE where the parents are the source of the failure."].)

23.    *Determination of Issues No. 3, 4(a), and 5:* The District did not deny Student a FAPE by failing to provide behavioral, OT, or S/L services in conformity with his June 7, 2004 IEP and its January 5, 2005 Addendum in SYs 2004-2005, 2005-2006, or 2006-2007. Based on Factual Findings 31-92 and 108-118, every interruption in service was caused solely by Parents, not by any act or omission of the District.

*Procedural Requirements*

24.    In *Rowley*, the Supreme Court recognized the importance of adherence to the procedural requirements of the IDEA. (*Rowley, supra*, at pp. 205-06.) However, a procedural error does not automatically require a finding that a FAPE was denied. Since July 1, 2005, the IDEA has codified the pre-existing rule that a procedural violation results in a denial of FAPE only if it impedes the child's right to a FAPE, significantly impedes the parents' opportunity to participate in the decision-making process, or causes a deprivation of educational benefits. (20 U.S.C. § 1415(f)(3)(E)(ii); see, *W.G. v. Board of Trustees of Target Range School. Dist. No. 23* (9th Cir. 1992) 960 F.2d 1479, 1484.)

25.    An IEP must include a statement of the child's present levels of educational performance; a statement of measurable annual goals; a statement of the "extent ... to which" a child will not participate in a regular classroom with nondisabled children; a statement of the special education and related services to be provided, and their frequency, duration, and location; and a statement of how the child's progress toward the annual goals will be measured. (20 U.S.C. § 1414(d)(1)(A)(i); 34 C.F.R. § 300.347(a); Ed. Code, § 56345, subds. (a)(1), (2), (3).) A district must make a formal written offer in the IEP that clearly identifies the proposed program. (*Union School Dist. v. Smith* (9th Cir. 1994) 15 F.3d 1519, 1526.)

*Parental Participation in IEP Process*

26.    Federal and state law require that parents of a child with a disability must be afforded an opportunity to participate in meetings with respect to the identification, assessment, educational placement, and provision of a FAPE to their child. (34 C.F.R. § 300.501(a), (c); Ed. Code, §§ 56304; 56342.5.) School officials and staff do not predetermine an IEP simply by meeting to review and discuss a child's evaluation and programming in advance of an IEP meeting. (*N.L. v. Knox County Schs.* (6th Cir. 2003) 315 F.2d 688, 693 n.3.) However, a school district that predetermines the child's program and does not consider the parents' requests with an open mind has denied the parents' right to participate in the IEP process. (*Deal v. Hamilton County Bd. of Educ.* (6th Cir. 2004) 392 F.3d 840, 858.)

27.    A parent is a required member of the IEP team. (20 U.S.C. § 1414(d)(1)(B)(i); 34 C.F.R. § 300.344(a)(1); Ed. Code, § 56341, subd. (b)(1).) The team must consider the concerns of the parents throughout the IEP process. (20 U.S.C. § 1414(c)(1)(B), (d)(3)(A)(i), (d)(4)(A)(ii)(III); 34 C.F.R. §§ 300.343(c)(2)(iii), 300.346(a)(1)(i), (b), 300.533 (a)(1)(i); Ed. Code, § 56341.1, subds. (a)(1), (d)(3), (e).) While the IEP team should work toward reaching a

consensus, the school district has the ultimate responsibility to determine that the IEP offers a FAPE. (App.A to 34 C.F.R. Part 300, Notice of Interpretation, 64 Fed. Reg. 12473 (Mar. 12, 1999).)

28.    Education Code section 56329, subdivision (a)(3), requires that a copy of an assessment report "shall be given to the parent or guardian." However, neither that provision nor any other provision of special education law identifies the time by which an assessment must be given to a parent or guardian.

29.    A parent has meaningfully participated in the development of an IEP when she is informed of her child's problems, attends the IEP meeting, expresses her disagreement regarding the IEP team's conclusions, and requests revisions in the IEP. (*N.L. v. Knox County Schools, supra*, 315 F.3d at p. 693.) A parent who has an opportunity to discuss a proposed IEP and whose concerns are considered by the IEP team has participated in the IEP process in a meaningful way. (*Fuhrmann v. East Hanover Bd. of Educ., supra*, 993 F.2d at 1036.) A school district does not deny parental participation when it considers, but does not adopt, parental views. (*O'Dell v. Special School Dist.* (E.D.Mo., March 30, 2007) No. ___ , 47 IDELR 216.)

30.    An IEP team meeting must be convened at least annually, and whenever a student receives an initial formal assessment, demonstrates a lack of progress, or a parent or teacher requests a meeting to develop, review, or revise the IEP. (Ed. Code, § 56343.) One "take it or leave it" IEP meeting is insufficient to permit adequate parental participation, but four meetings are sufficient to allow parents to address their concerns. (*Student v. Poway Unified School Dist.*, OAH Case No. N2006010985, July 10, 2006.) If an annual IEP meeting has already been held, and the student has not been assessed in the interim, a district need not accede to parents' desire to have another IEP meeting simply to express their continued disagreement. (*Student v. Colton Joint Unified School Dist.*, OAH Case No. N2005080436, Feb. 22, 2006.)

31.    *Determination of Issue 4(b):* The District did not violate the IDEA's procedural provisions in its dealings with Student or Parents. Based on Factual Findings 93-96, the delay in convening the IEP meeting of January 5, 2006, was unavoidable, and without consequence to Parents or Student. Based on Factual Findings 97-100, and Legal Conclusion 28, the District was not required to furnish its triennial assessments to Parents before the January 5, 2006 IEP meeting, and its failure to do so was without consequence to Parents or Student. Based on Factual Findings 101-104, the District timely provided notice to Parents of the withdrawal of CLASS from the provision of services to Student. Based on Factual Findings 103-04, the District made an offer of placement to Student on January 5, 2006, and had no reason to repeat it in subsequent sessions of the same meeting on January 19 and February 14. Based on Factual Finding 105, the fact that the District did not have a representative of Stepping Stones at the February 14, 2006 IEP meeting was without consequence to Parents or Student. Based on Factual Findings 106-107, the District did not prevent Parents from observing the Haight Elementary School SDC until June 8, 2006, or until students were not present.

32.    *Determination of Issue No. 6:* The District did not violate the procedural requirements of IDEA in SY 2006-2007 by refusing to convene an IEP meeting from June 20, 2006, to the present. Based on Factual Finding 119, and Legal Conclusion 30, the District

correctly determined that Parents' disagreements with the outstanding IEP offer had been thoroughly aired in four previous meetings, and that they sought another IEP meeting only to continue to express the same disagreements.

*Requirement of a behavior intervention plan*

33.    If a child's behavior impedes his learning or that of others, an IEP team must consider the use of positive behavioral interventions and supports, and other strategies, to address that behavior. (20 U.S.C. § 1414(d)(3)(B)(i); 34 C.F.R. § 300.346(a)(2)(i); Ed. Code § 56341.1, subd. (b)(1).) The IEP team must consider a behavior intervention plan when the student exhibits a serious behavior problem that significantly interferes with the implementation of the goals and objectives of her IEP. (Cal. Code Regs., tit. 5, § 3001, subd. (f).) A serious behavior problem is behavior that is self-injurious or assaultive, causes serious property damage, or is pervasive and maladaptive and not effectively controlled by the instructional and behavioral approaches specified in the student's IEP. (*Id.*, subd. 3001(aa).)

*Limitation of Issues*

34    A party requesting a due process hearing may not raise issues at the hearing that were not raised in the request for due process hearing, unless the other party agrees otherwise. (20 U.S.C. § 1415(f)(3)(B); Ed. Code, § 56502, subd. (i); *County of San Diego v. California Special Education Hearing Office* (9th Cir. 1996) 93 F.3d 1458, 1465.)

35.    A district responding to a request for reimbursement for an IEE "may initiate a due process hearing pursuant to Chapter 5 (commencing with Section 56500) to show that its assessment is appropriate." (Ed. Code, § 56329, subd. (c).) No provision of law authorizes a hearing officer to rule that an assessment is appropriate, unless the district initiates a hearing to make that showing and seek that ruling.

*Reimbursement*

36.    Parents may be entitled to reimbursement for the costs of placement or services they have procured for their child when the school district has failed to provide a FAPE, and the private placement or services were appropriate under the IDEA and replaced services that the district failed to provide. (20 U.S.C. § 1412(a)(10)(C); *School Committee of Burlington v. Department of Educ.* (1985) 471 U.S. 359, 369-371.) Parents may receive reimbursement for their unilateral placement if the placement met the child's needs and provided the child with educational benefit. However, the parents' unilateral placement is not required to meet all requirements of the IDEA. (*Florence County Sch. Dist. Four v. Carter* (1993) 510 U.S. 7, 13-14.)

37.    Based on Factual Findings 150-55, Parents are not entitled to any additional reimbursement beyond the monies they have already received for services provided at public expense.

*Burden of Proof*

38.    Petitioner has the burden of proving the essential elements of his claim.  (*Schaffer v. Weast* (2005) 546 U.S. 56, 62 [163 L.Ed.2d 387].)

39.    *Determination of Issue No. Eight:*  Based on Factual Findings 1-155 and Legal Conclusions 1-38 , Student is not entitled to relief.


## ORDER

For the foregoing reasons, Petitioner's requests in Case Nos. N2006090010 and N2006100740 are denied.  The District's request in Case No. N2006100365 is granted: the District offered Student a FAPE for SY 2006-2007 by offering to place him in the SDC at Haight Elementary School, with related services and supports.


## PREVAILING PARTY

Education Code section 56507, subdivision (d), requires this decision to indicate the extent to which each party prevailed on each issue heard and decided.  The District prevailed on all issues.


## RIGHT TO APPEAL THIS DECISION

The parties to this case have the right to appeal this Decision to a court of competent jurisdiction.  If an appeal is made, it must be made within ninety (90) days of receipt of this decision.  (Ed. Code, § 56505, subd. (k).)


Dated:  June 19, 2007


CHARLES MARSON
Administrative Law Judge
Office of Administrative Hearings
Special Education Division

## PROOF OF SERVICE

I, **Rosie Ruiz**, declare as follows: I am over 18 years of age and have no interest in the action within; my place of employment and business address is:

**Office of Administrative Hearings**
**Special Education Division**
**2349 Gateway Oaks, Suite 200**
**Sacramento, CA 95833-4231**

On **June 19, 2007**, I served a copy of the following entitled action:

### DECISION - OAH CASE NOs. – 2006090010/2006100365/2006100740

to each of the person(s) named below, at the address set out next to each name, by the following method:

Linda and Francis Pedraza
22 Souza Court
Alameda, CA 94502

Karen E Samman, Esq.
Lozano Smith Attorneys at Law
2000 Crow Canyon Place, Suite 200
San Ramon, CA 94583-1344

☒ **US MAIL** — by enclosing the action in a sealed envelope and placing the envelope for collection and mailing on that date and at the Office of Administrative Hearings, City of Sacramento, County of Sacramento, State of California, following ordinary business practices. I am readily familiar with the Office of Administrative Hearings' practice for collecting and processing correspondence for mailing. On the same day that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service in a sealed envelope with postage fully prepaid.

XX  Regular Mail

☐ **FACSIMILE TRANSMISSION** — by personally transmitting to the above-named person(s), who has previously agreed to receive documents via facsimile transmission, to the facsimile number(s) shown above, on the date and time listed below, from facsimile machine number , pursuant to California Rules of Court, rules 2003-2008, Government Code section 11440.20, and California Code Regulations, title 1, section 1008, subdivision (d). A true copy of the above-described documents(s) was transmitted by facsimile transmission and the transmission was reported as complete and without error. A copy of the transmission report, properly issued by the transmitting machine, is attached to this proof of service.

I declare under penalty of perjury, under the laws of the State of California, that the foregoing is true and correct, and this Declaration was executed at **Sacramento, California** at

**4:12 PM** on the **19** of **June**, 2007. _____
                                                            Rosie Ruiz

Exhibit C

BEFORE THE
OFFICE OF ADMINISTRATIVE HEARINGS
SPECIAL EDUCATION DIVISION
STATE OF CALIFORNIA

| | |
|---|---|
| In the Matter of:<br><br>ALAMEDA UNIFIED SCHOOL DISTRICT,<br><br>                              Petitioner,<br><br>v.<br><br>MICHAEL PEDRAZA,<br><br>                              Respondent. | OAH CASE NO. N2007100793<br><br><br>**ORDER DENYING STAY OF PROCEEDINGS** |

On October 31, 2007, Linda Haynes-Pedraza, parent of Student, sent a letter to the Office of Administrative Hearings (OAH) requesting that the proceedings in this matter be "stayed." The parent's request that this matter be stayed based upon a "forthcoming" motion to consolidate this matter with a pending federal district court case. It is unclear from the request whether the motion to consolidate has been filed or not in federal court. The District did not file a response to the request.

## DISCUSSION

Student's request to stay the proceedings in this matter is based upon the motion to consolidate which may not have been filed yet and an argument that the matters in this case "merge" with the federal court claims. Student also argued that the State of California is a party to the federal action and, therefore, the parents could not receive a fair hearing from the OAH, presumably because OAH is a state agency. Student offers no authority for his position.

A due process hearing must be conducted and a decision rendered within 45 days of receipt of the due process notice unless an extension is granted. (34 C.F.R. § 300.515(a); Ed. Code, §§ 56502, subd. (d), 56505, subd. (f).) Speedy resolution of the due process hearing is mandated by law and continuance of the hearing may be granted only upon a showing of good cause. (Ed. Code, § 56505, subd. (f).) The OAH has the sole authority to hear special education due process matters. (Ed. Code § 56500-56509.)

Here, Student has not offered any authority that this matter must be stayed pending a federal court matter.  Student states that this matter "merges" with the federal court matter, but does not provide any information for this contention and does not provide any information about how this matter is related to the federal case.  Moreover, granting a stay of proceedings would be inconsistent with OAH's mandate to conduct due process hearings within the statutory timeframe.

Accordingly, the motion to stay proceedings is denied.  All dates currently scheduled in this matter are confirmed.

IT IS SO ORDERED.

Dated: November 6, 2007

RICHARD M. CLARK
Administrative Law Judge
Office of Administrative Hearings
Special Education Division

## PROOF OF SERVICE

I, **Stacey Ures**, declare as follows: I am over 18 years of age and have no interest in the action within; my place of employment and business address is:

**Office of Administrative Hearings**
**2349 Gateway Oaks**
**Suite 200**
**Sacramento, CA 95833-4231**

On **November 06, 2007**, I served a copy of the following entitled action:

## ORDER DENYING STAY OF PROCEEDINGS- OAH CASE NO. - 2007100793

to each of the person(s) named below, at the address set out next to each name, by the following method:

Francisco & Linda Pedraza
22 Souza Court
Alameda, CA 94502
*Via Overnight Mail

Karen E. Samman, Esq.
Lozano Smith
FAX: 925-302-2010

☒ **US MAIL** – by enclosing the action in a sealed envelope and placing the envelope for collection and mailing on that date and at the Office of Administrative Hearings, City of Sacramento, County of Sacramento, State of California, following ordinary business practices. I am readily familiar with the Office of Administrative Hearings' practice for collecting and processing correspondence for mailing. On the same day that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service in a sealed envelope with postage fully prepaid.

XX  Overnight Mail to Parents

☒ **FACSIMILE TRANSMISSION** – by personally transmitting to the above-named person(s), who has previously agreed to receive documents via facsimile transmission, to the facsimile number(s) shown above, on the date and time listed below, from facsimile machine number (916) 376-6319, pursuant to California Rules of Court, rules 2003-2008, Government Code section 11440.20, and California Code Regulations, title 1, section 1008, subdivision (d). A true copy of the above-described documents(s) was transmitted by facsimile transmission and the transmission was reported as complete and without error. A copy of the transmission report, properly issued by the transmitting machine, is attached to this proof of service.

I declare under penalty of perjury, under the laws of the State of California, that the foregoing is true and correct, and this Declaration was executed at Sacramento, California at **4:01 PM** on the **6** of **November**, 2007. _____

Stacey Ures

**SENDING REPORT**

Nov. 13 2007 06:25PM

YOUR LOGO    : PEDRAZA LINDA
YOUR FAX NO. : 510 749-7072

| NO. | OTHER FACSIMILE | START TIME | USAGE TIME | MODE | PAGES | RESULT |
|-----|-----------------|------------|------------|------|-------|--------|
| 01  | 8642309         | Nov. 13 06:20PM | 05'19 | SND | 06 | OK |

TO TURN OFF REPORT, PRESS 'MENU' #04.
THEN SELECT OFF BY USING '+' OR '-'.

FOR FAX ADVANTAGE ASSISTANCE, PLEASE CALL 1-800-HELP-FAX (435-7329).

# URGENT NOTICE
# FAX COVER PAGE

From:  Fax # (510) 749-7072

Total Number of Pages: _____

To:  Rosalind Davenport

From:  Linda L. Haynes-Pedraza

Date:  November 13, 2007

Re:    Parent Addendum to September IEP, Response to October
       Correspondence, OAH Hearing Request

Dear Ms. Davenport:

Please find the attached correspondence for your perusal!

Thank You!

Sent Via: Facsimile
U.S. Certified Overnight Mail

Mr. & Mrs. Francisco Pedraza
22 Souza Court
Alameda, CA 94502
(510) 522-9232
(510) 749-7020 (Fax)

November 13, 2007

Office of Administrative Hearing
Special Education Unit
2349 Gateway Oaks Drive, Suite #200
Sacramento, CA 95833

RE:  OAH No. N2007100793

Dear Administrative Law Judge:

I am Linda Pedraza and my husband is Francisco Pedraza, and we are the parents of
Michael Pedraza, a student eligible for special education and related services through the
Alameda Unified School District herein after "AUSD."

We are writing to advise you that due to previously scheduled travel and commitments
for the Thanksgiving holiday. We will not be available to attend the assigned hearing
scheduled for November 26, 2007.

We request that a new hearing date be assigned according to our earliest availability
which would be the 13th, 14 or 17th of December 2007.   Your favorable consideration
and reply is most appreciated!

Sincerely,

Linda L. Haynes-Pedraza

cc: Rosalind Davenport, AUSD, Special Education Director

Sent Via: Facsimile
U.S. Certified Mail

Mr. & Mrs. Francisco Pedraza
22 Souza Court
Alameda, CA 94502
(510) 522-9232
(510) 749-7072

November 13, 2006

Rosalind Davenport
AUSD Special Education Director
1900 Third Street
Alameda, CA 94501

RE: Response to October 2007 Correspondence

Dear Ms. Davenport,

I am writing in response to your October correspondence. Please find attached a copy of
a letter which was sent to you by our advocate Tracy Bailey (see Exhibit A)

Contrary, to what your October 4, 2007 letter alleges you were informed of our need to
cancel the school observation, and our request to schedule an IEP, which was proposed at
the September 19, 2007 meeting; however, to be later confirmed after we spoke with Dr
Smith regarding her availability to accompany us to the next meeting.

Upon contacting Dr. Smith regarding her availability, we accordingly proposed the
meeting dates outlined in Ms. Bailey's letter to you. We were disappointed with your
correspondence which stated that the Alameda Unified School District would not hold the
proposed IEP meeting to discuss: our son's educational needs, Dr. Smith's report, and to
agree on appropriate goals which were all the subject of the September 19, 2007 meeting.

We were quite surprised to find that the AUSD filed a hearing complaint on October 24
alleging the District had made a FAPE available to our son; when in fact it was the
District, specifically you, who barred us from our right to meaningfully participate in the
IEP process and to formulate an appropriate education for our son.

1

Additionally, contrary to your October 9, 2007 correspondence, the goal of the proposed IEP meeting dates made at the September 19, 2007 IEP was to discuss Dr. Smith's evaluation of Michael, to agree on appropriate goals, and discuss an appropriate placement based on the agreed upon goals and objectives.

You informed us in your October 9th correspondence that the District was canceling the proposed IEP dates, and further informed us that you would not hold an IEP meeting ignoring our request. It is not for you or your counsel to decide whether you will conduct an IEP.

The law is clear an IEP must be held within thirty days upon the request of a parent. Your position on this matter makes it evident that you are not operating in a *"collaborative spirit"*, nor are you interested in meeting the needs of Michael without resorting to *"browbeating"* tactics.

We hope that you will reconsider your position in this matter.

Sincerely,

Linda L. Haynes-Pedraza

cc: Michael Pedraza, School File/Record
    Esq.

2

Sent Via: Facsimile

U.S. Certified Mail

Mr. & Mrs. Francisco Pedraza
22 Souza Court
Alameda, CA 94502
(510) 522-9232
(510) 749-7072

November 13, 2006

Rosalind Davenport
AUSD Special Education Director
1900 Third Street
Alameda, CA 94501

RE: Parent Addendum to the IEP Notes of September 19, 2007

Dear Ms. Davenport,

Please attach this letter as our parent notes and addendum to the District's IEP notes from the September 19, 2007 IEP meeting.

The meeting took shape around Ms. Davenport's August 14, 2007 correspondence which outlined her request for an IEP. This meeting was reportedly to discuss my August 13, 2007 correspondence and the prescription for services outlined in Dr. Smith's evaluation.

Subsequent to the parties convening the meeting Ms. Davenport rattled on about: who requested the meeting. I then referred her to the August 14th letter which settled the matter of who called for the IEP, the meeting was convened at the request of the District

The District presented no agenda for the meeting, however, Ms. Davenport commented that Dr. Smith had not conducted an evaluation of Michael and that the information relating to the proposed school placement of the District was inaccurate, she further alleged that Dr. Smith evaluation and prescription for services was merely a letter.

I reminded Ms. Davenport that our advocate, Ms. Bailey sent her correspondence on the 8th of September requesting the District's questions and concerns with Dr. Smith's report. Ms. Bailey, our advocate further collaborated this request after a lengthy exchange and debate over why Ms. Davenport did not provide her concerns to us in advance of the September 19th IEP.

1

We further explained that this would have allowed us to have Dr. Smith address her concerns in her absence of this meeting. I advised Ms. Davenport that the proposed classroom for the 2007-2008 school year was not available at the time that Ms. Wells and I went to the proposed school site at Earhart School on June 12, 2007; and I further explained that the District had not made a FAPE available to Michael because that facility was not a working facility at the time of our visit.

We advised the District that we did not agree with the District proposed goals and objectives as they did not reflect Michael's current baseline. We attempted a discussion of our proposed objectives which the Districted ignored and insisted that their proposed objectives were appropriate.

I did not agree to the proposed objectives and our discussion was to be continued at the proposed IEP meeting. Which the District subsequently canceled and refused to hold a discussion with our son's Development Neuro-psychologist, and ourselves to discuss the appropriate goals and objectives, and Dr. Smith's evaluation and prescription for services.

The goals presented which were presented by Ms. Wells and me were substantially different from the District proposed objectives. We were not allowed to meaningfully participate in this IEP.

Although the District maintained its offer of placement and services: we have not seen the actual classroom proposed, there has not been an agreement of appropriate goals and objectives for Michael, the District did not discuss with us what we believed to be an appropriate transition plan for Michael at the June 27th IEP or at the Sept 19th IEP, appropriate teaching methodologies and behavioral strategies for Michael have not been discussed and agreed upon, and our request to see educational setting throughout the SELPA has been ignored.

A FAPE has not been made available to our son!

Respectfully,

Linda L. Haynes-Pedraza

**Proof of Service**

I, _Gustave W Link_ (name), declare, under penalty of perjury:

I am over age 18, not a party to this action, and I am employed or reside in _Alameda_ (county).

On _11/14/07_ (date), I transmitted the following named document, _Petition for writ_

to the parties named below by the method indicated:

☐ The Clerk of the Superior Court    Service By: ☐ U. S. Mail  ☒ Express Service  ☐ Hand  ☐ Messenger

_San_ _Mateo_
(County)

GUSTAVE .W. LINK
(Street or mailing address)    PO BOX 5705
REDWOOD CITY, CA 94063
(City, State, Zip Code

---

☐ Attorney of Record  ☒ In Propria Persona Party    Service By: ☐ U. S. Mail  ☒ Express Service  ☐ Hand  ☐ Messenger

_Charles Marsh, ALJ._    State Bar Number: _____
(Name)    OAH

_2349 Gateway Oaks, Suite #200_
(Street or mailing address)

_Sacramento, CA 95833-4231_    Party Represented: _____
(City, State, Zip Code

---

☐ Attorney of Record  ☒ In Propria Persona Party    Service By: ☐ U. S. Mail  ☒ Express Service  ☐ Hand  ☐ Messenger

_Barbara Clark, OU_    State Bar Number: _____
(Name)    OAH

_2349 Gateway Oaks, Suite #200_
(Street or mailing address)

_Sacramento, CA 95833-4231_    Party Represented: _____
(City, State, Zip Code

---

☐ Attorney of Record  ☒ In Propria Persona Party    Service By: ☐ U. S. Mail  ☒ Express Service  ☐ Hand  ☐ Messenger

_Rosalina Davenport, AUSD_    State Bar Number: _____
(Name)

_190 Third St_
(Street or mailing address)

_Alameda, CA 94501_    Party Represented: _____
(City, State, Zip Code

---

☐ Attorney of Record  ☒ In Propria Persona Party    Service By: ☐ U. S. Mail  ☐ Express Service  ☐ Hand  ☐ Messenger

_Linroy Brain, Law Offices_    State Bar Number: _____
(Name)

_1900 Broadway St_
(Street or mailing address)

_Oakland, CA 94612_    Party Represented: _____
(City, State, Zip Code

---

☐ Court of Appeal    Service By: ☐ U. S. Mail  ☐ Express Service  ☐ Hand  ☐ Messenger

State Bar Number: _____
(Name)

(Street or mailing address)

Party Represented: _____
(City, State, Zip Code

Dated _____    Signature _____

*M.P. v. Office of Administrative Hearings,* CASE NO. C 07-05989 EMC

Notice of Removal of Action; Under 28 U.S.C. § 1441(b) (Federal Question)

# Exhibit B

CM-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address)*: | FOR COURT USE ONLY |
|---|---|
| *Linda Pedraza on Behalf of Michael Pedraza as Guardian ad litum*<br>TELEPHONE NO.: *510 522 9282*    FAX NO.: *510 749-7072*<br>ATTORNEY FOR *(Name)*: | **ENDORSED**<br>**FILED**<br>**ALAMEDA COUNTY**<br><br>NOV 14 2007<br><br>CLERK OF THE SUPERIOR COURT<br>By **BARBARA LAMOTTE**<br>Deputy |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF
STREET ADDRESS: ALAMEDA COUNTY SUPERIOR COURT
                1225 FALLON STREET
MAILING ADDRESS:
CITY AND ZIP CODE: OAKLAND CA 94612-4280
BRANCH NAME:

CASE NAME: *Michael Pedraza vs. OAH Respondents Et Al*

| CIVIL CASE COVER SHEET | | Complex Case Designation | | CASE NUMBER: |
|---|---|---|---|---|
| ☒ Unlimited<br>(Amount<br>demanded<br>exceeds $25,000) | ☐ Limited<br>(Amount<br>demanded is<br>$25,000 or less) | ☐ Counter    ☐ Joinder<br><br>Filed with first appearance by defendant<br>(Cal. Rules of Court, rule 3.402) | | *RG* 07356345<br><br>JUDGE:<br>DEPT: |

*Items 1–6 below must be completed (see instructions on page 2).*

**1. Check one box below for the case type that best describes this case:**

| Auto Tort | Contract | Provisionally Complex Civil Litigation<br>(Cal. Rules of Court, rules 3.400–3.403) |
|---|---|---|
| ☐ Auto (22) | ☐ Breach of contract/warranty (06) | ☐ Antitrust/Trade regulation (03) |
| ☐ Uninsured motorist (46) | ☐ Rule 3.740 collections (09) | ☐ Construction defect (10) |
| **Other PI/PD/WD (Personal Injury/Property<br>Damage/Wrongful Death) Tort** | ☐ Other collections (09) | ☐ Mass tort (40) |
| ☐ Asbestos (04) | ☐ Insurance coverage (18) | ☐ Securities litigation (28) |
| ☐ Product liability (24) | ☐ Other contract (37) | ☐ Environmental/Toxic tort (30) |
| ☐ Medical malpractice (45) | **Real Property** | ☐ Insurance coverage claims arising from the<br>above listed provisionally complex case<br>types (41) |
| ☐ Other PI/PD/WD (23) | ☐ Eminent domain/Inverse<br>condemnation (14) | |
| **Non-PI/PD/WD (Other) Tort** | ☐ Wrongful eviction (33) | **Enforcement of Judgment** |
| ☐ Business tort/unfair business practice (07) | ☐ Other real property (26) | ☐ Enforcement of judgment (20) |
| ☐ Civil rights (08) | **Unlawful Detainer** | **Miscellaneous Civil Complaint** |
| ☐ Defamation (13) | ☐ Commercial (31) | ☐ RICO (27) |
| ☐ Fraud (16) | ☐ Residential (32) | ☐ Other complaint *(not specified above)* (42) |
| ☐ Intellectual property (19) | ☐ Drugs (38) | **Miscellaneous Civil Petition** |
| ☐ Professional negligence (25) | **Judicial Review** | ☐ Partnership and corporate governance (21) |
| ☐ Other non-PI/PD/WD tort (35) | ☐ Asset forfeiture (05) | ☐ Other petition *(not specified above)* (43) |
| **Employment** | ☐ Petition re: arbitration award (11) | |
| ☐ Wrongful termination (36) | ☒ Writ of mandate (02) | |
| ☐ Other employment (15) | ☐ Other judicial review (39) | |

2. This case ☒ is  ☐ is not  complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. ☐ Large number of separately represented parties     d. ☐ Large number of witnesses
   b. ☐ Extensive motion practice raising difficult or novel     e. ☐ Coordination with related actions pending in one or more courts
      issues that will be time-consuming to resolve              in other counties, states, or countries, or in a federal court
   c. ☒ Substantial amount of documentary evidence     f. ☐ Substantial postjudgment judicial supervision

3. Remedies sought *(check all that apply)*: a.☒ monetary  b.☒ nonmonetary; declaratory or injunctive relief  c. ☐ punitive
4. Number of causes of action *(specify)*:
5. This case ☐ is  ☐ is not  a class action suit.
6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*

Date: *11/14/07*

*Linda Pedraza* ▶ [signature] *for ... Guardian ...*
(TYPE OR PRINT NAME)                    (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

| Form Adopted for Mandatory Use<br>Judicial Council of California<br>CM-010 [Rev. July 1, 2007] | **CIVIL CASE COVER SHEET** | Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;<br>Cal. Standards of Judicial Administration, std. 3.10<br>www.courtinfo.ca.gov |

CM-010

## INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you must complete and file, along with your first paper, the *Civil Case Cover Sheet* contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check **one** box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the **primary** cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the *Civil Case Cover Sheet* to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

### CASE TYPES AND EXAMPLES

**Auto Tort**
Auto (22)–Personal Injury/Property
    Damage/Wrongful Death
Uninsured Motorist (46) *(if the
    case involves an uninsured
    motorist claim subject to
    arbitration, check this item
    instead of Auto)*

**Other PI/PD/WD (Personal Injury/
Property Damage/Wrongful Death)
Tort**
Asbestos (04)
    Asbestos Property Damage
    Asbestos Personal Injury/
        Wrongful Death
Product Liability *(not asbestos or
    toxic/environmental)* (24)
Medical Malpractice (45)
    Medical Malpractice–
        Physicians & Surgeons
    Other Professional Health Care
        Malpractice
Other PI/PD/WD (23)
    Premises Liability (e.g., slip
        and fall)
    Intentional Bodily Injury/PD/WD
        (e.g., assault, vandalism)
    Intentional Infliction of
        Emotional Distress
    Negligent Infliction of
        Emotional Distress
    Other PI/PD/WD

**Non-PI/PD/WD (Other) Tort**
Business Tort/Unfair Business
    Practice (07)
Civil Rights (e.g., discrimination,
    false arrest) *(not civil
    harassment)* (08)
Defamation (e.g., slander, libel)
    (13)
Fraud (16)
Intellectual Property (19)
Professional Negligence (25)
    Legal Malpractice
    Other Professional Malpractice
        *(not medical or legal)*
Other Non-PI/PD/WD Tort (35)

**Employment**
Wrongful Termination (36)
Other Employment (15)

**Contract**
Breach of Contract/Warranty (06)
    Breach of Rental/Lease
        Contract *(not unlawful detainer
        or wrongful eviction)*
    Contract/Warranty Breach–Seller
        Plaintiff *(not fraud or negligence)*
    Negligent Breach of Contract/
        Warranty
    Other Breach of Contract/Warranty
Collections (e.g., money owed, open
    book accounts) (09)
    Collection Case–Seller Plaintiff
    Other Promissory Note/Collections
        Case
Insurance Coverage *(not provisionally
    complex)* (18)
    Auto Subrogation
    Other Coverage
Other Contract (37)
    Contractual Fraud
    Other Contract Dispute

**Real Property**
Eminent Domain/Inverse
    Condemnation (14)
Wrongful Eviction (33)
Other Real Property (e.g., quiet title) (26)
    Writ of Possession of Real Property
    Mortgage Foreclosure
    Quiet Title
    Other Real Property *(not eminent
    domain, landlord/tenant, or
    foreclosure)*

**Unlawful Detainer**
Commercial (31)
Residential (32)
Drugs (38) *(if the case involves illegal
    drugs, check this item; otherwise,
    report as Commercial or Residential)*

**Judicial Review**
Asset Forfeiture (05)
Petition Re: Arbitration Award (11)
Writ of Mandate (02)
    Writ–Administrative Mandamus
    Writ–Mandamus on Limited Court
        Case Matter
    Writ–Other Limited Court Case
        Review
Other Judicial Review (39)
    Review of Health Officer Order
    Notice of Appeal–Labor
        Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal.
Rules of Court Rules 3.400–3.403)**
Antitrust/Trade Regulation (03)
Construction Defect (10)
Claims Involving Mass Tort (40)
Securities Litigation (28)
Environmental/Toxic Tort (30)
Insurance Coverage Claims
    *(arising from provisionally complex
    case type listed above)* (41)

**Enforcement of Judgment**
Enforcement of Judgment (20)
    Abstract of Judgment (Out of
        County)
    Confession of Judgment *(non-
        domestic relations)*
    Sister State Judgment
    Administrative Agency Award
        *(not unpaid taxes)*
    Petition/Certification of Entry of
        Judgment on Unpaid Taxes
    Other Enforcement of Judgment
        Case

**Miscellaneous Civil Complaint**
RICO (27)
Other Complaint *(not specified
    above)* (42)
    Declaratory Relief Only
    Injunctive Relief Only *(non-
        harassment)*
    Mechanics Lien
    Other Commercial Complaint
        Case *(non-tort/non-complex)*
    Other Civil Complaint
        *(non-tort/non-complex)*

**Miscellaneous Civil Petition**
Partnership and Corporate
    Governance (21)
Other Petition *(not specified
    above)* (43)
    Civil Harassment
    Workplace Violence
    Elder/Dependent Adult
        Abuse
    Election Contest
    Petition for Name Change
    Petition for Relief From Late
        Claim
    Other Civil Petition